Louis **HARTMAN**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 16605.

United States Court of Appeals Ninth Circuit.

May 8, 1961.

Albert M. Bendich, Staff Counsel, American Civil Liberties Union of Northern California, and Hartly Fleischmann, San Francisco, Cal., for appellant.

Lynn J. Gillard, U. S. Atty., and Bernard Petrie, Sp. Atty., San Francisco, Cal., and Anthony A. Ambrosio, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before ORR, MAGRUDER and JERTBERG, Circuit Judges.

JERTBERG, *Circuit Judge.*

Appellant appeals from a judgment of conviction on all counts of a seven-count indictment charging him for having unlawfully refused to answer seven questions pertinent to a matter under inquiry before a Subcommittee of the House Committee on Un-American Activities,

in violation of Title 2 U.S.C.A. § 192.[1] The case was tried before a district judge, a jury trial having been expressly waived by the appellant. Appellant was sentenced to six months imprisonment on each count, the sentences to run concurrently, and to pay a fine of $100 on the first count.

On June 4, 1957, appellant was subpoenaed to appear at hearings to be conducted by a subcommittee of the Committee on Un-American Activities of the House of Representatives, scheduled to begin on June 18, 1957, in San Francisco, California. Appellant appeared on June 18, 1957, and remained in attendance at the hearing all that day. He was called to testify on the following day. Appellant answered questions concerning his background, giving his name; place and date of birth; that he resided at Berkeley, California, and had been a resident thereof for approximately 12 years; that his occupation was a radio broadcaster; and giving his formal academic training. He refused to answer seven questions,[2]

1. Title 2 U.S.C.A. § 192 provides: "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

2. The questions are:
    1. "Have you been a member, and are you a member now, of a professional cell of the Communist Party at Berkeley?"
    2. "Will you tell the committee, please, how many professional cells of the Communist Party there are in Berkeley?"
    3. "Now, sir, will you advise the committee of propaganda activities that are now being carried on by the Professional Section or group of the Communist Party in Berkeley?"

4. "Were you not at the time of the publishing of that article in the People's World, March 24, 1949, when you were quoted as I have read, engaging in an activity of the professional cell of the Communist Party in Berkeley designed to embarrass the United States in its foreign policy?"
    5. "Is the professional cell of the Communist Party in Berkeley now carrying on a campaign of propaganda in any manner—in regard to the Sobell Committee?"
    6. "I have before me a copy of the July 30, 1957 issue of the People's World. This article reports that you were to participate in a cultural conference to be held on August 2 and 3 under the auspices of the California Labor School. From this article it appears that John Howard Lawson was to be the keynoter and that the cultural conference was broken down in panels. Under the motion picture panel appears the name of A. Polonsky, a screen writer; Waldo Salt, whose profession was also that of a screen writer; and yourself, under the name of Lou Hartman. There has been very extensive evidence before this committee of the Communist Party membership of John Howard Lawson, Abe Polonsky, and Waldo Salt. There

each of which is set forth in a separate count of the indictment. Following each refusal appellant was specifically directed to answer by the subcommittee chairman.

The first question to which appellant objected and which he refused to answer [refusal to answer this question is not the subject of any count in the indictment] is as follows: "Have you had any other educational training at any school besides those that you have mentioned?" To which appellant replied:

"In respect to the question, sir, I wish to make the following objection: (1) The committee's authorizing resolution and the subject of the hearings as announced by the committee are vague and indefinite in that they fail to inform me of the nature, purpose, and extent and limitations of the hearing or the matters about which I have been called to testify. Therefore, the question posed is not pertinent or relevant to any legitimate, valid, definitive legislative purpose and thus violates my rights under due process of law under the fifth amendment, as held by the United States Supreme Court, as held in the case United States v. Watkins, [354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273].

"(2) The first amendment prohibits Congress from passing any law infringing on speech, conscience, and assembly. The mandate of this committee and the purposes announced at this hearing are unconstitutional in attempting to authorize it to investigate into an area in which the Constitution forbids it to legislate.

"(3) Questions asked me concerning my political beliefs and associations under the circumstances of these hearings abridge my rights of freedom of speech and association protected by the first amendment.

"(4) The inquiry of the committee and the purposes of this hearing are inquiry into affairs unrelated to any valid legislative purpose under Article I of the Constitution and are solely designed for the purpose of exposing myself and others to publicity and ridicule.

"(5) The committee's inquiry is for the purpose of placing me on trial without any of the rights guaranteed by the due process of laws of the fifth amendment and of the sixth amendment which affords me the right to notice of any charges, the effective aid of counsel, adequate time to prepare a defense, right of cross-examination, and the presumptions of innocence.

"(6) This committee's inquiry infringes on the rights retained by the people and the States under the 9th and 10th amendments. This hearing and this committee's inquiries are unconstitutional infringements by the legislature into the jurisdiction of the judiciary which has the sole power under the Constitution to place me on trial and to inquire into my personal conduct."

To all of the questions contained in the indictment appellant objected and refused to answer them on the grounds hereinbefore stated. He was repeatedly asked if he objected to and refused to answer questions on the ground of "pertinency of the questions" and he repeatedly stated that his objections and refusals were based upon the grounds hereinbefore stated. Appellant expressly dis-

has been considerable evidence relating to the activities, propaganda and otherwise, of the California Labor School. Will you state whether or not the occasion to which I have referred was the result of Communist Party consultation and planning?"

7. "I have asked you whether or not you were the chairman of the Professional Section of the Communist Party in Berkeley, which you refused to answer, and I will now ask you whether or not you are a member of the Communist Party on any level whether supersecret or not."

claimed that his objections to and refusal to answer any of the questions were based on the self-incriminating provisions of the Fifth Amendment to the United States Constitution.

The district court entered its order staying the execution of the sentences imposed upon appellant pending appeal, and granted appellant's motion for leave to prosecute this appeal in forma pauperis.

Appellant's specifications of errors on this appeal may be summarized as follows:

(1) Congress did not authorize the San Francisco hearings;

(2) The delineation by Congress of the Committee's authority to conduct the San Francisco hearing was too vague to satisfy the requirements of due process;

(3) The indictment questions were in violation of appellant's rights under the First Amendment;

(4) That the Committee's primary purpose was exposure for exposure's sake, in violation of the constitutional guarantee of the separation of powers and the prohibition of attainder;

(5) The indictment questions were not pertinent;

(6) The evidence was insufficient upon which to base a conviction and that the district court, in denying appellant the aid of compulsory process for his defense, deprived appellant of a fair trial in violation of the Sixth Amendment, and of personal liberty in violation of the due process clause of the Fifth Amendment;

(7) That the proceedings of the Committee were invalidated because of the failure of the Committee to observe the House ruling to prohibit the hearings from being televised; and

(8) That appellant's refusals to answer were not wilful because of his reliance upon the decision of the Supreme Court in Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273.

Rule X of the standing Rules of the House of Representatives, as amended by the Legislative Reorganization Act of 1946, c. 753, § 121, 60 Stat. 812, 822, 823, provides for a Committee on Un-American Activities as a standing committee to be elected by the House at the commencement of each Congress. Under Rule XI (60 Stat. 823, 828), all proposed legislation relating to the subject of Un-American activities is to be referred to this Committee, which is authorized to investigate "(i) the extent, character, and objects of un-American propaganda activities in the United States, (ii) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (iii) all other questions in relation thereto that would aid Congress in any necessary remedial legislation." These standing Rules were, in addition, specially adopted by the House, at the beginning of the Eighty-fifth Congress (during which the offenses here involved occurred), as part of the rules of the House for that Congress. H.Res. 5, 85th Congress.

On January 22, 1957 the Committee on Un-American Activities met in executive session and adopted a resolution authorizing its Chairman to appoint subcommittees of the Committee to carry on the work of the Committee. On June 11, 1957, the Chairman of the Committee, pursuant to the authority previously conferred upon him, appointed a four-member subcommittee to conduct hearings of the subcommittee scheduled to be held at San Francisco, California, designating himself as chairman of the subcommittee.

The hearings commenced on June 18, 1957. Immediately prior to interrogating the first witness, the Chairman of the subcommittee made an opening statement, setting forth the nature and pur-

pose of the investigation and hearings.[3] In the course of the statement the chairman of the subcommittee enumerated a number of legislative recommendations and proposals (dealing with the subject of Communism and Communist Party activities) which he stated would be the subject for consideration on which the subcommittee would seek to elicit information during the course of the hearing. Among those he listed were recommendations and proposals (1) to revise the passport laws with respect to applicants for passports who were members of the Communist Party; (2) to clarify the Federal Lobbying Act, 2 U.S.C.A. § 261 et seq., so as to remove any doubt regarding its applicability to organizations and associations under Communist influence and direction; (3) to strengthen the provisions of the Foreign Agents

Registration Act, 22 U.S.C.A. § 611 et seq., in order to counteract the schemes and devices used in avoiding the prohibitions of the act with regard to the tremendous flow of political propaganda of a Communist origin entering this country; and (4) to outlaw the Communist party as such.

Appellant testified that he had been present and had heard the statement of the chairman of the subcommittee as to the purpose and nature of the hearings.

Following the first question, to which appellant objected and which he refused to answer, set forth supra, counsel for the committee inquired of the appellant:

"Are you objecting to the question on the grounds that you fail to see its pertinency?"

3. Extracts from the statement made by the subcommittee chairman:

"The following is an extract from the minutes of an executive meeting held on the 15th of May 1957:

"'Counsel for the committee called the chairman's attention to the fact that although the proposed hearings on June 18, 1957, in San Francisco, had been discussed and authorized by the committee, no record of the action taken had been incorporated in the minutes; whereupon a motion was made by Mr. Willis, seconded by Mr. Doyle and unanimously carried, authorizing the setting up of hearings in San Francisco beginning on the 18th day of June, 1957, and the conduct of investigations deemed reasonably necessary by the staff in preparation therefor, the subject of which hearings and the investigations in connection therewith to include all matters within the jurisdiction of the committee, with special reference to the extent, character, and objects of Communist Party activities within the professions and propaganda activities of a Communist origin.'

✻ ✻ ✻ ✻ ✻

"Congress has placed upon this committee the duty of investigating the extent, character, and objects of un-American propaganda activities in the United States, the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and all other questions in relation

thereto that would aid Congress in any necessary remedial legislation. Congress has also placed upon this committee the duty of exercising continuous watchfulness of the execution by the administrative agencies concerned with any laws, the subject matter of which is within the jurisdiction of this committee.

"It is the purpose of the committee, in the conduct of this hearing, to discharge the duties thus imposed upon it by calling witnesses who it has reason to believe possess information which will be of value to it and to Congress in the intelligent consideration of legislative means of more adequately protecting our form of government and our country from the threat of international communism.

✻　　✻　　＊　　＊　　＊

"This committee began hearings in February 1953, and has continued them intermittently ever since, for the purpose of determining the extent, character, and objects of Communist Party activities of individual members of the teaching profession with the view of determining what legislation, if any, is needed in this field. Information on this subject will be important to Congress in any legislation it enacts in the field of education. Another purpose of this hearing is to solicit additional information on this subject.

"In addition to the foregoing subjects to be considered at this hearing, the committee will hear any other matter within the jurisdiction of the committee which may develop from the testimony."

To which appellant replied: "I am objecting on the issues of points 1 through 7, which I have just stated."

Committee Counsel: "Specifically, are you raising the question that you do not understand the pertinency of the question?"

Appellant: "I believe the statement I have just made, Mr. Tavenner, is what I am trying to say. I admit that the legal language is a little unusual for me, but that is what I believe."

Committee Counsel: "Due to the fact that the witness will not answer specifically the last question I asked, I will pass on to a question the pertinency of which may be more apparent to the witness. Have you been a member, and are you a member now, of a professional cell of the Communist Party at Berkeley?"

Appellant: "My answer to the question just posed is the answer which I gave to your first question, Mr. Tavenner, points 1 through 7 as stated, and they are in the record."

Committee Counsel: "I will try to explain to you the pertinency of the question and, assuming that that is the real basis of your refusal to answer, with the hope that when you see its pertinency that you will answer."

\*    \*    \*    \*    \*    \*

Committee Counsel: "The committee has been endeavoring to ascertain the workings of the professional groups of the Communist Party within this area. As far as you are concerned, it relates to Berkeley, not to the city of San Francisco. That is the only difference.

"The question of the activity, that, is the extent, the character and the objectives of Communist Party activities in the professional groups of the Communist Party is a very important matter to the committee because it is now and has been for a considerable period of time considering and weighing the question of need for further legislation with regard to the Communist Party.

"As the chairman pointed out to you and others, numerous bills have been introduced in the House of Representatives from time to time to outlaw the Communist Party as such. There has been some difference of opinion by individual members of this committee on that subject but the committee has not taken action recommending such procedure to the present time. It feels that it must be informed on that subject. It feels that Congress expects to be informed on that subject and therefore we are now hearing evidence which will be of value to Congress and this committee on that matter.

"Now, so much for the subject.

"You say you do not understand the pertinency of that question?"

Appellant: "Excuse me, sir. I did not say that. I am sorry."

Committee Counsel: "It would seem to me that the question is pertinent on its face, that no one with any intelligence would need to have the pertinency explained, when I asked you the question of whether or not you are at this time a member of the professional cell of the Communist Party in Berkeley.

"Of course it is important for us to know that because you are a man, as you say, engaged in an important field of work. This committee is entitled to know of these facts.

"Now the reasoning of the committee as to why that question is pertinent is that there is no way for the committee to ascertain facts regarding the activities of a secret cell of the Communist Party, you might say a supersecret cell because, as we understand from evidence, even the rank-and-file members of the Communist Party do not know either the names or the activities of such a group, and how can Congress be in-

formed of the activities of such group if it cannot ascertain who are in it in order to question?

\* \* \* \* \*

"Now does that explain the pertinency of the question to you?"

Appellant: "Respectfully, Mr. Tavenner, I stand on the objection previously stated."

Committee Counsel: "You did not honestly give that objection because you felt you did not understand the question. You are merely offering it as an excuse for refusal to testify when you made up your mind as to a course which you were going to take?"

Appellant: "I can only ask, Mr. Tavenner, that you believe me when I say that my objections are as stated."

Committee Counsel: "That your objection is that you do not see the pertinency of the question?"

Appellant: "My objection is, sir, as stated in points 1 through 7."

We have carefully examined the record in the instant case in light of the principles of law applicable thereto as stated by the Supreme Court in Watkins v. United States, 1957, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273; Barenblatt v. United States, 1959, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115; Wilkinson v. United States, 365 U.S. 399, 81 S.Ct. 567, 5 L. Ed.2d 633; and Braden v. United States, 365 U.S. 431, 81 S.Ct. 584, 5 L.Ed.2d 653. In our view all questions raised by appellant in this case were settled in such cases adversely to the contentions of the appellant in this case except three. The three questions which remain unsettled may be summarized as follows: (1) that the proceedings of the committee were invalidated because the appearance of appellant before the subcommittee was televised, an alleged violation of a rule of the House of Representatives; (2) that the rights guaranteed to appellant under the First Amendment to the Constitution of the United States were violated, in that his compulsory appearance before the committee was without probable cause for belief by the committee that appellant possessed information which might be helpful to the subcommittee in the course of its hearings; and (3) that the district court, in denying appellant the aid of compulsory process to require the attendance of witnesses and production of documents in his behalf, deprived appellant of a fair trial in violation of the Sixth Amendment and of personal liberty in violation of the due process clause of the Fifth Amendment.

■ Under the first contention appellant contends that the Rules of the House of Representatives prohibited the televising of the subcommittee's hearings in San Francisco, the claimed result of which is to invalidate such proceedings. We are unable to agree with appellant's contentions for at least two reasons. In the first place, appellant has failed to establish the existence of such a rule governing the Eighty-fifth Congress. The Standing Rules of the House of Representatives, as amended by the Legislative Reorganization Act of 1946, c. 753, §§ 121–123, 60 Stat. 812, 822 et seq. are silent on the subject of televising House proceedings. No formal interpretation of the Rules with respect to televising was made by the Speaker of the House during the Eighty-fifth Congress. Appellant relies upon a ruling of the Speaker of the House during the preceding Congress interpreting the House Rules as not authorizing the televising of the proceedings of the House or its committees. The Speaker had made a similar ruling during the Eighty-second Congress. The Speaker was not called upon to formally rule on the television question during the Eighty-fifth Congress. Furthermore, appellant has failed to convince us that the Speaker of the House of Representatives, assuming the existence of such a rule for the Eighty-fifth Congress, intended a violation thereof would invalidate House or committee proceedings. The action of the House in directing the Speaker to certify appellant's refusal to answer the questions at the subcommittee hearing to the United

States Attorney for prosecution indicates that no such intent existed. In the second place, appellant lacks standing to challenge a violation of the alleged rule. Some of the witnesses, including appellant, were seen on the television as they were testifying. Seven of the witnesses, however, requested that they not be televised and in each case the witness' request was honored by the subcommittee. Two of the seven witnesses appeared as witnesses before the appellant was called and at a time when the appellant was in attendance at the hearing. Appellant neither objected to the televising of the hearing nor did he request that his appearance be not televised. His refusal to answer the questions was based upon entirely other grounds. He raised the television issue for the first time at his trial in the district court. Under these circumstances appellant's contention is without merit. See United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884, and United States v. Fleischman, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906.

■ We will now consider the second question above mentioned.

Following the opening statement by the subcommittee chairman, the subcommittee proceeded with the taking of testimony. Thirty-one witnesses were examined during the course of the hearings. Of these, 29 were questioned concerning the activities of professional groups of the Communist Party in the San Francisco Bay area. The questions directed to 28 of these witnesses related to such activities in San Francisco proper. Appellant was the only witness who was asked questions about such activities in Berkeley, California.

Two witnesses testified about the activities of the party professional groups in San Francisco, one of such witnesses testifying to such activities up through 1948 but not beyond that date, the other witness testifying to such activities in San Francisco from 1942 until 1952. Neither witness had any information about such party professional group activity in Berkeley, California. No witness who appeared before the committee testified concerning appellant's knowledge or activity relating to Communist activity in the San Francisco Bay area or elsewhere. No witness mentioned or identified the appellant as a member of the Communist Party. No information concerning appellant, his activities in or knowledge of communistic activities were revealed in previous hearings of the Committee. So far as the record is concerned, the only knowledge of appellant or his activities possessed by the committee was an unsigned report dated May 29, 1957, furnished to the committee by its West Coast investigator, which we set forth in the footnote.[4] It is patent to us that

---

4. "May 29, 1957. To: Richard Arens, Director

"From William Wheeler, Investigator

"Subject: Louis Earl Hartman

"The above subject was born June 2, 1915, in Brooklyn, New York. He attended Johns Hopkins University from 1932 to 1935 and received an A.B. degree from Illinois University in 1936. He married Marjorie Lowry on December 1, 1944, at Alexandria, Virginia, and they were divorced on April 11, 1946. They have one son, Landis Lowry Hartman. He married his present wife, Blanche Loeb Gelders, on June 23, 1947, at Davis, California.

"He has been employed by various radio stations in Chicago, Oklahoma City and San Francisco for many years. Since December of 1948 he has been employed by the Columbia Broadcasting System, Radio Station KCBS, Palace Hotel, San Francisco. He is the producer of 'This is San Francisco', a 15 minute radio program heard daily Monday through Saturday from 7:15 a. m. to 7:30 a. m. On this program he uses the professional name of Jim Grady.

"He resides with his wife at 2139 Stuart Street, Berkeley, California. He was a member of the Berkeley Branch of the Communist Party from 1947 to 1949. In 1949 he was chairman of the East Bay Arts, Sciences and Professions Council and collaborated with Holland Roberts of the California Labor School in arranging meetings of Arts, Sciences and Professions delegates to a Peace Conference held in the Bay area in April of 1949. The March 24, 1949 issue of

many of the statements and conclusions contained in the report were based upon sources other than the personal observation and knowledge of the investigator. At the trial in the district court this report was received in evidence at the instance of the government, not for the truth of its contents, but to show probable cause on the part of the committee for compelling the compulsory attendance of the appellant.

It appears to us that the power of Congress to compel a person, by the process of subpoena, to appear as a witness at a hearing before one of its duly authorized committees is not unlimited. However, there is a paucity of authority on this point. In Watkins v. United States, supra, the Court stated, 354 U.S. at page 187, 77 S.Ct. at page 1179:

"It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation. This, of course, assumes that the constitutional rights of witnesses will be respected by the Congress as they are in a court of justice. The Bill of Rights is ap-

plicable to investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms of speech, press, religion, or political belief and association be abridged."

In United States v. Orman, 3 Cir., 1953, 207 F.2d 148, at pages 154–155, it is suggested that a Congressional Committee may not possess "the power to examine private citizens indiscriminately in the mere hope of stumbling upon valuable information and to cite them for contempt if they refuse to answer." In Barenblatt v. United States, supra, appears the following in 360 U.S. at page 134, 79 S.Ct. at page 1097:

"Finally, the record is barren of other factors which in themselves might sometimes lead to the conclusion that the individual interests at stake were not subordinate to those of the state. There is no indication in this record that the Subcommittee was attempting to pillory witnesses. Nor did petitioner's appearance as a witness follow from indiscriminate dragnet procedures, *lacking probable cause for belief that he possessed information which might be helpful to the Subcommittee.*" (Italics added.)

the Daily Peoples World said he was Chairman of the East Bay Arts, Sciences and Professions Council. He received large amounts of literature from the Independent Progressive Party, Civil Rights Congress and the Labor Youth League in 1948 and was reported a member of the Berkeley Branch of the Civil Rights Congress as of June, 1951. He was a yearly subscriber to the Daily Peoples World in 1948, 1950 and 1951. He and his wife were both members of Evans-Carlson Club of the Independent Progressive Party in 1952, 1953 and 1954.

"He attended a series of lectures sponsored by the California Labor School at 160 Grand Avenue, Oakland, California, in July and August of 1951. He was active in attending functions for Twentieth

Century Book Store at Norway Hall, 3928 Piedmont Avenue, Oakland, on June 26, 1954. Also active in May Day celebration and Book Fair on May 1, 1955.

"He has been active in the East Bay Sobell Committee in 1956 and was in close contact with Communist Party leadership in San Francisco East Bay Area in same year. He was a member of a Berkeley Communist Party Club in 1956 and 1957. In January, 1957, information was that at that time Hartman had been in the Communist Party for 11 years and was active in the PTA and local church functions and that he was a member of the American Federation of Television and Radio Artists Trade Union and that he was chairman of his Communist Party club."

In Wilkinson v. United States, supra, 365 U.S. 399, 81 S.Ct. at page 567 the Court stated:

> "The subcommittee *had reasonable ground to suppose that the petitioner was an active Communist Party member,* and that as such he possessed information that would substantially aid it in its legislative investigation." (Italics added.)

While there may be limitations on the power of Congress to compel a person to attend as a witness before a Congressional committee, which we do not decide, and which we do not propose to explore in this case for we deem it unnecessary to do so, we are of the view that neither any limitation on the power of the committee in this respect nor whether probable cause existed in this case for belief by the committee that appellant possessed information which might be helpful to the committee was an issue in the contempt trial. We believe that in this case the government was not required to offer evidence on the subject of probable cause in order to establish a prima facie case against the appellant, for the reason that at the time of appellant's appearance before the committee he made no objection on any ground to his compulsory appearance. His objections were directed solely to the authority of the committee to hold the hearing and the propriety, relevance and pertinency of the questions asked and to be asked of him. In particular, he made no objection to his compulsory appearance before the committee on the ground that the committee lacked probable cause to believe that he had knowledge or information concerning the subject matter under inquiry which might be helpful to the committee. Having waived any objections which he might have to compulsory attendance before the committee, appellant was foreclosed from asserting any such objection in the contempt trial. See discussion in Barenblatt v. United States, supra, 360 U.S. at pages 123 and 124, 79 S.Ct. 1081, concerning failure of a witness to object on the ground of "pertinency". In our view, the matter of probable cause was not reviewable in the contempt trial nor on this appeal.

■ We now consider the third contention above mentioned. On February 9, 1959, appellant moved the district court for the issuance of indigent subpoenas and subpoenas duces tecum. The subpoenas duces tecum were to be directed to the Clerk of the United States House of Representatives, Washington, D. C., and the Clerk of the Committee on Un-American Activities of the House of Representatives. Generally these subpoenaes were designed to obtain production of all records, files, documents and written information relating to or containing information about the appellant and 29 other named persons who were called to testify before the committee at the San Francisco hearing, and the activities and proposed activities since December 1, 1953 of the Communist Party in Berkeley, California, in California, and in the United States, intended to overthrow the government of the United States or constituting or likely to constitute a clear and present danger to the government of the United States, of the State of California, or any other State. The subpoenas were to be directed to the members of the subcommittee of the House Un-American Activities Committee present at the hearing; the counsel for the committee; the director of the committee, and the West Coast investigator of the committee. The affidavits filed in support of the motion alleged that the evidence sought to be obtained from the documents and the named persons would establish the absence of any information concerning the appellant or the other 29 persons who were called to testify of any activities conducted or engaged in subject to the jurisdiction of the Committee on Un-American Activities, the absence of any lawful legislative purpose on the part of the committee in seeking to question appellant and the other 29 persons, and that the information ostensibly sought to be obtained was available to the committee prior to the hearing. The district court denied appellant's motion. Later,

and on February 26, 1959, appellant renewed his motion for issuance of subpoenas based upon supplementary affidavits of counsel for appellant in addition to the previously filed papers in support of the motion. The supplementary affidavits in the main alleged that the persons sought to be subpoenaed would testify that no specific legislative purpose was ever determined by the committee in regard to the San Francisco hearing; that the purpose of the hearing was designed to expose and harass appellant; that prior to the San Francisco hearing the committee was in possession of complete information about appellant and alleged communistic activities which provided answers to all the questions which appellant was asked and was adequate to serve any legislative purpose of the committee; that the files and records of the committee sought by subpoena duces tecum would show complete and reliable information by the committee concerning all matters inquired into by the committee at the San Francisco hearing; and that no information was possessed by the committee showing any subversive activities by appellant or that he had any knowledge of such activity. This renewed motion was denied by the district court. Prior to the commencement and during the course of the trial, appellant renewed his motion for issuance of such subpoenas. Such motions were likewise denied. Appellant renewed a motion made by him prior to the trial to dismiss the indictment, on the ground that appellant had been unable to prepare his defense because of the denial of his motions to have issued the indigent subpoenas.

The main thrust of appellant's motions was apparently designed to enable appellant to answer or rebut the statements contained in the report concerning appellant and his activities furnished to the committee by the West Coast representative of the committee, in short, to show lack of probable cause on the part of the committee in requiring the compulsory attendance of appellant as a witness at the committee hearing. Since we have already indicated that such subject was not an issue in the contempt proceedings, the evidence sought to be obtained by appellant on such subject was irrelevant and immaterial to appellant's defense. Other information sought related to the motives of the members of the committee in conducting the San Francisco hearing and in compelling appellant's attendance as a witness. The information sought was not relevant. Likewise information sought to prove that there was no compelling need for the information sought to be elicited from appellant is immaterial. In other respects the motions were patently unreasonable and oppressive and were not supported by any specific statement of relevant and material testimony expected to be secured, as required by Rule 17(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. We find no abuse of discretion on the part of the district court in denying appellant's motions.

■ Before concluding this opinion we should state that the question which appellant refused to answer, and which is set forth in count one of the indictment, i. e., "Have you been a member, and are you a member now, of a professional cell of the Communist Party at Berkeley?" was patently pertinent to the subject under inquiry by the committee, and he was properly convicted on that count. Appellant received concurrent prison sentences and was fined only on the first count. We need not, therefore, review the pertinency of the questions contained in the remaining counts of the indictment. See Barenblatt v. United States, supra, and Wilkinson v. United States, supra.

The judgment appealed from is affirmed.