## YELLIN *v.* UNITED STATES.

No. 35. Argued April 18–19, 1962.—Restored to the calendar for reargument June 25, 1962.—Reargued December 6, 1962.—Decided June 17, 1963.

110

*Victor Rabinowitz* reargued the cause for petitioner. With him on the briefs was *Leonard B. Boudin.*

*Solicitor General Cox* reargued the cause for the United States. With him on the briefs were *Assistant Attorney General Yeagley, Bruce J. Terris, Kevin T. Maroney* and *Lee B. Anderson.*

*Osmond K. Fraenkel* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This contempt of Congress case, stemming from investigations conducted by the House Committee on Un-American Activities, involves, among others, questions of whether the House Committee on Un-American Activities failed to comply with its rules and whether such a failure excused petitioner's refusal to answer the Committee's questions.

Petitioner Edward Yellin was indicted in the Northern District of Indiana on five counts of willfully refusing to answer questions put to him by a Subcommittee of the House Committee on Un-American Activities (hereafter Committee) at a public hearing. He was convicted, under 2 U. S. C. § 192, of contempt of Congress on four counts. He was sentenced to four concurrent terms of imprisonment, each for one year, and fined $250. The Court of Appeals for the Seventh Circuit affirmed. 287 F. 2d 292. Since the case presented constitutional questions of continuing importance, we granted certiorari. 368 U. S. 816. However, because of the view we take of the Committee's action, which was at variance with its rules, we do not reach the constitutional questions raised.[1]

The factual setting is for the most part not in dispute. The Committee was engaged, in 1958, in an investigation of so-called colonization by the Communist Party in basic industry. One of its inquiries focused upon the steel industry in Gary, Indiana, where petitioner was employed. Having information that petitioner was a Communist, the Committee decided to call Yellin and question him in a public rather than an executive session. The Committee then subpoenaed petitioner on January 23, 1958. His attorney, Mr. Rabinowitz, sent a telegram to the Committee's general counsel, Mr. Tavenner, on Thursday, February 6, 1958. The telegram asked for an executive session because "testimony needed for legislative . . . purposes can be secured in executive session without exposing witnesses to publicity." Since the Committee and

---

[1] The constitutional questions upon which we need not pass are whether the Committee's investigation infringed upon petitioner's rights under the First Amendment and whether petitioner was convicted under an unconstitutionally vague statute. In addition, we do not discuss petitioner's contention that the trial judge erred in excluding expert testimony about the factors which should be considered in determining petitioner's rights under the First Amendment.

Mr. Tavenner had left Washington, D. C., for Gary, the telegram was answered by the Committee's Staff Director. His reply read:

"Reurtel [Re your telegram?] requesting executive session in lieu of open session for Edward Yellin and Nicholas Busic. Your request denied.
"Richard Arens Staff Director"

According to Congressman Walter, the Chairman of the Committee, Mr. Arens did not have authority to take such action.

Petitioner's counsel also sought to bring the matter to the Committee's attention when it commenced its public hearing the following Monday, February 10, 1958. His efforts to have the telegrams read into the record were cut short by Congressman Walter.[2] Mr. Rabinowitz would not have been justified in continuing, since Committee rules permit counsel only to advise a witness, not to engage in oral argument with the Committee. Rule

---

[2] The Committee's General Counsel had asked Mr. Yellin a few preliminary questions when Mr. Rabinowitz interrupted.

"Mr. RABINOWITZ. Mr. Counsel [Mr. Tavenner], I wonder whether it would be possible to read into the record the exchange of telegrams between myself and the committee in connection with the witness's testimony. I would like to have it appear in the record.

"The CHAIRMAN. We will decide whether it will be made a part of the record when the executive session is held. Go ahead.

"Mr. RABINOWITZ. Mr. Chairman, I sent the telegrams because I wanted them to appear. I do not care whether they appear publicly or not. I do want it to appear that that exchange of telegrams occurred. I did not do it just to increase the revenue of the telegram company.

"The CHAIRMAN. Well, whatever the reason was, whether it has been stated or otherwise, it will be considered in executive session.

"Mr. RABINOWITZ. May I state—

"The CHAIRMAN. Do not bother. You know the privileges given you by this committee. You have appeared before it often enough. You know as well as anybody. Go ahead, Mr. Tavenner."

VII (B). In any event, Congressman Walter was not interested in discussing the content of the telegrams. From his sometimes conflicting testimony at trial, it appears he did not even know what the telegrams said.[3] And though Congressman Walter said the Committee would consider in executive session whether to make the telegrams a part of the record, it appears that whatever

---

[3] Consider, for example, the following testimony of Congressman Walter:

"Q. [By Mr. RABINOWITZ] So that at the time I raised at this hearing the question of the telegrams, you didn't know anything about any telegrams, and you weren't sufficiently interested to find out what I was talking about; is that right?

"A. [By Congressman WALTER] Well, not exactly that, Mr. Rabinowitz. I was interested in knowing. I knew that you made an application for an executive session.

"Q. How did you know that?

"A. Well, the telegram; at least, that's what you started to talk about.

"Q. You knew it at the time of the hearing?

"A. No. Isn't that what you started to talk about?

"Q. When did you first learn that I had made an application for an executive session?

"A. *I believe today.* I never had seen these telegrams, actually. I heard you mention them, at least now my recollection is that I heard you mention them, *but I haven't seen them until this minute.*" (Emphasis added.)

See also the following testimony:

"Q. [By Mr. RABINOWITZ] Well, weren't you interested in finding out what I was talking about?

"A. [By Congressman WALTER] I knew what you were talking about. You were talking about a telegram that you say you sent, and it was too late then to raise any question that might have been raised by the telegram."

- Later Congressman Walter said:

"I think the impression I got was that these were telegrams that were more or less in the nature of a request to postpone, without grounds, or whatever it was that Mr. Tavenner told me and the other members of the Committee; and I think that we were just not impressed by it."

action was taken was without knowledge of the telegrams' contents.[4]

It is against this background that the Committee's failure to comply with its own rules must be judged. It has been long settled, of course, that rules of Congress and its committees are judicially cognizable. *Christoffel v. United States,* 338 U. S. 84; *United States v. Smith,* 286 U. S. 6; *United States v. Ballin,* 144 U. S. 1. And a legislative committee has been held to observance of its rules, *Christoffel v. United States, supra,* just as, more frequently, executive agencies have been. See, *e. g., Vitarelli v. Seaton,* 359 U. S. 535; *Service v. Dulles,* 354 U. S. 363.

The particular Committee Rule involved, Rule IV, provides in part:

"IV—Executive and Public Hearings:

"A—*Executive:*

"(1) If a majority of the Committee or Subcommittee, duly appointed as provided by the rules of the House of Representatives, believes that the interrogation of a witness in a public hearing might

---

[4] The following occurred during Mr. Rabinowitz' direct examination of Congressman Walter:

"Q. Well, did you, or did you not, take it up in executive session as you said you would?

"A. I am not clear; I think that we probably did talk about making it a part of the record, and I think the conclusion was reached that it was not properly a part of the record already made.

"Q. Didn't you testify, Congressman, just a few minutes ago, while you were on the stand, that the first you knew about the contents of the telegram was just now, when you got on the witness stand?

"A. That's right.

"Q. So you discussed this whole matter in executive session after the Gary hearings, without even knowing what the telegrams said?

"A. That's about it.

"Q. And you reached the conclusion not to make them a part of the record without even knowing what was in them?

"A. That's right. . . ."

endanger national security or *unjustly injure his reputation,* or the reputation of other individuals, the Committee *shall* interrogate such witness in an Executive Session for the purpose of determining·the necessity or advisability of conducting such interrogation thereafter in a public hearing.

"B—*Public Hearings:*
"(1) All other hearings shall be·public." (Emphasis added.)

The rule is quite explicit in requiring that injury to a witness' reputation be considered, along with danger to the national security and injury to the reputation of third parties, in deciding whether to hold an executive session.

At the threshold we are met with the argument that Rule IV was written to provide guidance for the Committee alone and that it was not designed to confer upon witnesses the right to request an executive session and the right·to have the Committee act, either upon that request or on its own, according to the standards set forth in the rule. It seems clear, from the structure of the Committee's rules and from the Committee's practice, that such is not the case.

The rules are few in number and brief—all 17 take little more than six pages in the record. Yet throughout the rules the dominant theme is definition of the witness' rights and privileges. Rule II requires that the subject of any investigation be announced and that·information sought be "relevant and germane to the subject." Rule III requires that witnesses be subpoenaed "a reasonably sufficient time in advance" to allow them a chance to prepare and employ counsel. Rule VI makes available to any witness a transcript of his testimony—though at his expense. Rule VII gives every witness the privilege of having counsel advise him during the hearing. Rule VIII gives a witness a reasonable time to get other coun-

sel, if his original counsel is removed for failure to comply with the rules. Rule X makes detailed provision for those persons who have been named as subversive, Fascist, Communist, etc., by another witness. Such persons are given an opportunity to present rebuttal testimony and are to be "accorded the same privileges as any other witness appearing before the Committee." Rule XIII permits any witness to keep out of the range of television cameras. Finally, Rule XVII requires that each witness "shall be furnished" a copy of the rules. All these work for the witness' benefit. They show that the Committee has in a number of instances intended to assure a witness fair treatment, viz., the right to advice of counsel, or protection from undue publicity, viz., the right not to be photographed by television cameras. Rule IV, in providing for an executive session when a public hearing might unjustly injure a witness' reputation, has the same protective import. And if it is the witness who is being protected, the most logical person to have the right to enforce those protections is the witness himself.

The Committee's practice reinforces this conclusion. Congressman Walter testified that the Committee "always" gave due consideration to requests for executive sessions.[5] Weight should be given such a practice of

_____

[5] Mr. Rabinowitz asked Congressman Walter:

"But it wasn't worth the chance of calling him in executive session, to see what his position would have been?

"A. I am sure that had you communicated this whole matter to the Committee before we left Washington so that we could have given it due consideration—*we would have, and always do*—we might have a different situation today." (Emphasis added.)

Congressman Walter also said he was "sure this could not have happened, had you [Mr. Rabinowitz] addressed your telegram to me."

Note also the following question by Mr. Rabinowitz and answer by Mr. Tavenner:

"Q. And does that rule [Rule IV] operate ever for the protection of a witness who is called?

"A. Certainly."

the Committee in construing its rules, *United States* v. *Smith,* 286 U. S. 6, 33. That the Committee has entertained, and always does entertain, requests for executive sessions reinforces the conclusion that the Committee intended in Rule IV to give the individual witness a right to some consideration of his efforts to protect his reputation.

It must be acknowledged, of course, that Rule IV does not provide complete protection. The Committee may not be required by its rules to avoid even unjust injury to a witness' reputation. Assuming that the Committee decides to hold an executive session, the Committee need do so only "for the purpose of determining the *necessity or advisability* of conducting such interrogation thereafter in a public hearing." (Emphasis added.) By inclusion of the word "necessity" the rule may contemplate cases in which the Committee will proceed in a public hearing despite the risk or even probability of injury to the witness' reputation.[6]

---

[6] Although, for reasons to be developed later, it does not appear that the Committee was following Rule IV in Yellin's case, it seems clear that the Committee realized its public interrogation of Yellin would injure his reputation. Congressman Walter testified, for example, that:

"A. . . . [T]he Committee already passed on the question of whether or not we would hear Mr. Yellin at a session when the purpose of calling him was discussed, and it was decided then that the rule with respect to an executive session was not applicable because the investigator—and I might say it was Mr. Collins, a former F. B. I. agent, who developed this entire matter, and we were willing to accept his story with respect to the proposed testimony.

"Q. And what was his story?

"A. Well, his story was that the man was a known Communist; that he had been active in the international conspiracy, and that he had deceived his employer; and, furthermore, he came within the category of those people that we were experiencing a great deal of difficulty in finding out about with respect to the colonization."

Mr. Tavenner also said he would not have recommended to the Committee that Yellin be heard in executive session "[b]ecause we

That petitioner may be questioned in public, even after an executive session has been held, does not mean, however, that the Committee is freed from considering possible injury to his reputation. The Committee has at least undertaken to consider a witness' reputation and the efforts a witness makes to protect it, even though the Committee may in its discretion nevertheless decide thereafter to hold a public hearing. The Committee failed in two respects to carry out that undertaking in Yellin's case.

First, it does not appear from Congressman Walter's testimony that the Committee considered injury to the witness' reputation when it decided against calling Yellin in executive session:

"Q. [By Mr. RABINOWITZ] The Committee does sometimes hold executive sessions, doesn't it?

"A. [By Congressman WALTER] Yes.

"Q. And what are the considerations which the Committee uses in determining whether to hold executive sessions?

"A. This is usually done when the Committee is fearful lest a witness will mention the name of somebody against whom there is no sworn testimony, and in order to prevent the name of somebody being mentioned in public that we are not sure has been active in the conspiracy, at least that there isn't sworn testimony to that effect, we have an executive hearing.

knew that he was a member of the Communist Party and he was in a position to give the Committee information, if he wanted to."

From the Committee's knowledge, whether it be reliable or not, the Committee could only have concluded that Yellin's reputation would suffer. Yet Congressman Walter said this was the kind of case in which a public hearing was appropriate.

"Q. Are those the only circumstances under which executive hearings are held?

"A. *I don't know of any other,* except that where we are fearful that testimony might be adduced that could be harmful to the national defense. We are not so sure about the testimony of any of the witnesses." (Emphasis added.)

By Congressman Walter's own admission, the Committee holds executive sessions in only two of the three instances specified in Rule IV, *i. e.,* when there may be injury to the reputation of a third party or injury to the national security. Injury to the witness himself is not a factor. Consequently the initial Committee decision to question Yellin publicly, made before serving him with a subpoena, was made without following Rule IV.

Secondly, the Committee failed to act upon petitioner's express request for an executive session.[7] The Staff Director, who lacked the authority to do so, acted in the Committee's stead. That petitioner addressed his request to the Committee's counsel does not alter the case. The Committee did not specify in Rule IV to whom such re-

---

[7] Any suggestion that petitioner's request was untimely cannot be accepted. For one thing, only 14 days intervened between service of the subpoena upon petitioner and delivery of his request to the Committee's offices in Washington. Also it is of some significance that the Committee did not hold another witness at the Gary hearings, one Joseph Gyurko, to the strict standard of timeliness now urged. Gyurko had sent a telegram to the Committee's offices in Washington about noon on Saturday, February 8, 1958. When Gyurko was called on Tuesday, February 11, he was given an executive hearing, even though Congressman Walter expressed the opinion that Gyurko had deliberately waited until after business hours on Saturday to send his request. Since the Committee did not even-handedly deny executive sessions to all who made such eleventh hour requests, it is not in a fair position to plead the untimeliness of Yellin's request.

quests should be addressed. But from other rules it may be inferred that the general counsel is an appropriate addressee. In Rule IX, the Committee permits witnesses to file prepared or written statements for the record. The statements are to be sent to the "counsel of the Committee." Rule X makes provision for third parties who have been named as subversive, Fascist, Communist, etc., in a public hearing. A person, notified of having been named, who feels that his reputation has been adversely affected is directed to "[c]ommunicate with the counsel of the Committee." As a footnote to that rule, the Committee has said: "All witnesses are invited at any time to confer with Committee counsel or investigators for the Committee prior to hearings." Also it should be noted that the Staff Director's telegraphed response had the misleading appearance of authority and finality. The Chairman of the Committee should not now be allowed to say that had petitioner disregarded the response he received from the Chairman's staff and instead renewed his request to the Chairman, "this could not have happened"—especially when petitioner's counsel tried to bring the matter to the attention of the Committee and was brusquely cut off.

Thus in two instances the Committee failed to exercise its discretion according to the standards which Yellin had a right to have considered. His position is similar to that of the petitioner in *United States ex rel. Accardi* v. *Shaughnessy,* 347 U. S. 260. Accardi had been ordered deported. Concededly the order was valid. However, Accardi applied to the Board of Immigration Appeals for suspension of the order. This, in the discretion of the Attorney General, was permitted by § 19 (c) of the Immigration Act of 1917, 39 Stat. 889, as amended, 8 U. S. C. (1946 ed., Supp. V) § 155 (c). (The successor to that section in the 1952 Act is § 244, 66 Stat. 214, 8 U. S. C.

§ 1254.) The Attorney General had by regulation permitted the Board of Immigration Appeals to make final decisions upon applications for this discretionary relief, subject to certain exceptions not involved in Accardi's case. Shortly before petitioner appealed to the Board, the Attorney General published a list of "unsavory characters," including petitioner, who were to be deported. Accardi claimed that since the Board knew he was on the list, it did not exercise the full discretion the Attorney General had delegated to it. Its decision was predetermined.

This Court held that the Board had failed to exercise its discretion though required to do so by the Attorney General's regulations. Although the Court recognized that Accardi might well lose, even if the Board ignored the Attorney General's list of unsavory characters, it nonetheless held that Accardi should at least have the chance given him by the regulations.

The same result should obtain in the case at bar. Yellin might not prevail, even if the Committee takes note of the risk of injury to his reputation or his request for an executive session. But he is at least entitled to have the Committee follow its rules and give him consideration according to the standards it has adopted in Rule IV.

At that point, however, the similarity to Accardi's case ends. Petitioner has no traditional remedy, such as the writ of habeas corpus upon which Accardi relied, by which to redress the loss of his rights. If the Committee ignores his request for an executive session, it is highly improbable that petitioner could obtain an injunction against the Committee that would protect him from public exposure. See *Pauling* v. *Eastland,* 109 U. S. App. D. C. 342, 288 F. 2d 126, cert. denied, 364 U. S. 900. Nor is there an administrative remedy for petitioner to pursue, should

the Committee fail to consider the risk of injury to his reputation. To answer the questions put to him publicly and then seek redress is no answer. For one thing, his testimony will cause the injury he seeks to avoid; under pain of perjury, he cannot by artful dissimulation evade revealing the information he wishes to remain confidential. For another, he has no opportunity to recover in damages, U. S. Const., Art. I, § 6; *Kilbourn* v. *Thompson,* 103 U. S. 168, 201–205. Cf. *Tenney* v. *Brandhove,* 341 U. S. 367, 377. Even the Fifth Amendment is not sufficient protection, since petitioner could say many things which would discredit him without subjecting himself to the risk of criminal prosecution. The only avenue open is that which petitioner actually took. He refused to testify.

As a last obstacle, however, the Government argues that Yellin's rights were forfeited by his failure to make clear at the time he was questioned that his refusal to testify was based upon the Committee's departure from Rule IV. Whatever the merits of the argument might be when immediately apparent deviations from Committee rules are involved,[8] it has no application here. Yellin was unable, at the time of his hearing, to tell from the actions of the Committee that his rights had been violated. So far as Yellin knew, the Staff Director acted as Congress-

---

[8] Although, as a matter of due process, a witness is entitled to an explanation of the pertinency of a question, if he asks for it, it appears he may lose that right if he fails to make a timely objection. See *Deutch* v. *United States,* 367 U. S. 456, 468–469; *Barenblatt* v. *United States,* 360 U. S. 109, 123–124; *Watkins* v. *United States,* 354 U. S. 178, 214–215.

For other instances in which a witness' defense has been rejected because he failed to make timely objection, see *McPhaul* v. *United States,* 364 U. S. 372, 379; *United States* v. *Bryan,* 339 U. S. 323, 332–333; *Hartman* v. *United States,* 290 F. 2d 460, 467.

man Walter's agent, announcing the results of the Committee's deliberations. And so far as he knew, the Committee, when it initially decided to hold a public hearing, did so in accordance with Rule IV. It was not until petitioner's trial, when his attorney for the first time had an opportunity for searching examination, that it became apparent the Committee was violating its rules.

It may be assumed that if petitioner had expressly rested his refusal to answer upon a violation of Rule IV and the Committee nevertheless proceeded, he would be entitled to acquittal, were he able to prove his defense. Otherwise, if Yellin could be convicted of contempt of Congress notwithstanding the violation of Rule IV, he would be deprived of the only remedy he has for protecting his reputation. Certainly the rights created by the Committee's rules cannot be that illusory.

Of course, should Yellin have refused to answer in the mistaken but good-faith belief that his rights had been violated, his mistake of law would be no defense. *Watkins* v. *United States,* 354 U. S. 178, 208; *Sinclair* v. *United States,* 279 U. S. 263, 299. But he would at least be entitled to submit the correctness of his belief to a court of law.

Yellin should be permitted the same opportunity for judicial review when he discovers at trial that his rights have been violated. This is especially so when the Committee's practice leads witnesses to misplaced reliance upon its rules. When reading a copy of the Committee's rules, which must be distributed to every witness under Rule XVII, the witness' reasonable expectation is that the Committee actually does what it purports to do, adhere to its own rules. To foreclose a defense based upon those rules, simply because the witness was deceived by the Committee's appearance of regularity, is not fair.

The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting to require that the Committee be equally meticulous in obeying its own rules.

*Reversed.*

MR. JUSTICE WHITE, with whom MR. JUSTICE CLARK, MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting.

Petitioner stands convicted of having refused, in violation of 2 U. S. C. § 192,[1] to answer four questions asked him by the Committee on Un-American Activities of the House of Representatives. He was sentenced to one year on each count, the sentences to run concurrently, and a fine of $250. The Court of Appeals affirmed unanimously, 287 F. 2d 292.

Pursuant to House of Representatives Rules XI [2] and

---

[1] "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

[2] "Rule XI

"Powers and Duties of Committees

. . . . .

"(q) (1) Committee on Un-American Activities.

"(A) Un-American activities.

"(2) The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (i) the extent, character, and objects of un-American propaganda activities in the United States, (ii) the diffusion within the United States of subversive and un-American propaganda that is

XII,[3] the Committee resolved that hearings would be held in Gary, Indiana, to inquire into Communist Party activities in basic industry.[4] Petitioner was subpoenaed to appear before the Committee in Gary on February 10, 1958. Four days prior to the hearing, petitioner's counsel

instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (iii) all other questions in relation thereto that would aid Congress in any necessary remedial legislation.

"The Committee on Un-American Activities shall report to the House (or to the Clerk of the House if the House is not in session) the results of any such investigation, together with such recommendations as it deems advisable.

"For the purpose of any such investigation, the Committee on Un-American Activities, or any subcommittee thereof, is authorized to sit and act at such times and places within the United States, whether or not the House is sitting, has recessed, or has adjourned, to hold such hearings, to require the attendance of such witnesses and the production of such books, papers, and documents, and to take such testimony, as it deems necessary. Subpenas may be issued under the signature of the chairman of the committee or any subcommittee, or by any member designated by any such chairman, and may be served by any person designated by any such chairman or member."

[3] "Rule XII

"Legislative Oversight by Standing Committees

"Sec. 136. To assist the Congress in appraising the administration of the laws and in developing such amendments or related legislation as it may deem necessary, each standing committee of the Senate and the House of Representatives shall exercise continuous watchfulness of the execution by the administrative agencies concerned of any laws, the subject matter of which is within the jurisdiction of such committee; and, for that purpose, shall study all pertinent reports and data submitted to the Congress by the agencies in the executive branch of the Government."

[4] The Committee's resolution enumerated these areas of inquiry:

"1. The extent, character, and objects of Communist infiltration and Communist Party propaganda activities in basic industry in the Gary, Indiana, area, the legislative purpose being to obtain additional information for use by the Committee in its consideration of

126

sent a telegram to the Committee's counsel requesting that petitioner be questioned in executive session in lieu of an open session. The Staff Director of the Committee responded the same day and denied the request.

Petitioner appeared on the appointed date with counsel. The Committee Chairman began the proceedings by reading the above-quoted resolution and by stating further the purposes of the inquiry.[5] The first witness, an or-

Section 16 of H. R. 9352, relating to the proposed amendment of Section 4 of the Communist Control Act of 1954, prescribing a penalty for knowingly and willfully becoming or remaining a member of the Communist Party with knowledge of the purpose or objective thereof, and for the additional legislative purpose of adding to the Committee's overall knowledge on the subject, so that Congress may be kept informed and thus prepared to enact remedial legislation in the national defense and for internal security when and if the exigencies of the situation require it.

"2. Execution by administrative agencies concerned of Public Law 637, of the 83d Congress known as the 'Communist Control Act of 1954,' relating to the eligibility to exercise the rights and privileges provided under the National Labor Relations Act of labor organizations determined by the Subversive Activities Control Board to be Communist-infiltrated organizations. The legislative purpose is to assist Congress in appraising the administration of the Communist Control Act of 1954 and to enact such amendments thereto as the exigencies of the situation require.

"3. Any other matter within the jurisdiction of the Committee which it or any subcommittee thereof, appointed to conduct this hearing, may designate."

[5] "Under the provisions of Public Law 601, 79th Congress, the Congress has placed upon this committee certain legislative and investigative duties and, in addition, the duty of exercising continuous watchfulness over the execution of any laws, the subject matter of which is within the jurisdiction of this committee. Accordingly, within the framework of this broad jurisdiction and objectives, this subcommittee of the Committee on Un-American Activities is here in Gary for the purpose of receiving testimony concerning Communist techniques and tactics of infiltration and the extent, character, and objects of Communist Party propaganda activities in basic industries. The importance of this area of inquiry from the standpoint of national

ganizer and high official in the Communist Party from 1930 to 1950, testified that the Party had begun a policy of infiltrating into basic industry, that Party "colonizers" were sent to coordinate Party work in these industries, including the steel industry, and that these colonizers were mainly young men from colleges and universities. These colonizers, he continued, would misrepresent their backgrounds in applying for jobs and would conceal their educational qualifications so as to gain jobs alongside other less-educated workers without casting suspicion on their motives.

---

security, cannot be overemphasized. Without this information, it would be impossible for the committee to carry out its legislative duties as required of it by the Congress.

"In response to the mandate from the Congress to keep constant surveillance over existing security legislation, the committee is constantly surveying the operation of the Internal Security Act of 1950, the Foreign Agents Registration Act, the various espionage statutes, the Communist Control Act of 1954, and similar laws for the purpose of keeping Congress informed of the manner in which laws are being administered and for the purpose of recommending any needed legislative amendments. This mandate will be carried out at this hearing.

"The committee recently formulated an Omnibus Security Bill, H. R. 9352, which represents the most comprehensive effort ever made to deal with all problems in the field of internal security. This bill combines numerous proposals for empowering the Government to combat the various aspects of the Communist conspiracy which are not dealt with adequately in our present laws. It is the hope of the committee that factual information obtained at this hearing will be of assistance in the consideration of the numerous provisions of this bill.

"The committee is especially desirous of obtaining additional information for use in its consideration of Section 16 of H. R. 9352, relating to the proposed amendment of Section 4 of the Communist Control Act of 1954, prescribing a penalty for knowingly and willingly becoming or remaining a member of the Communist Party with knowledge of the purpose or objective thereof."

Petitioner, who had been present for all of the foregoing, was called as the second witness immediately thereafter. After answering preliminary questions as to his name and address and after his counsel requested that the exchange of telegrams concerning the executive session be made part of the record, petitioner was asked the following question:

"Mr. Yellin, where did you reside prior to September 1957?" (Count 1.)

After conferring with counsel, petitioner refused to answer the question. He cited decisions of this Court in *Watkins* v. *United States*, 354 U. S. 178; *Sweezy* v. *New Hampshire*, 354 U. S. 234, and asserted that a congressional committee cannot investigate into areas protected by the First Amendment and into areas of personal belief and conscience, that the authorizing rule of the House of Representatives was unduly vague resulting in a denial of due process of law and that the questions he would answer would only be those pertinent to some legislation. He specifically disclaimed reliance on the privilege against self-incrimination. To indicate the pertinency of the question, the Committee's counsel stated that in order to learn anything from petitioner regarding Communist Party activities in the Gary area, it was necessary to know whether he was there over a period of time. When directed to answer the question after this statement, the petitioner again refused on the grounds above stated.

Petitioner was then asked to state his formal education and whether he was a student at the College of the City of New York, which he refused to do and, when directed to answer, added: "Mr. Tavenner, I will refuse to answer that question under the grounds already stated; but it just occurs to me that if the committee knows all these things, I can't see the purpose or the

pertinency of asking me what they consider a known fact. Furthermore, it kind of appears to me as if this line of questioning is merely trying to create an impression and expose me for the sake of merely exposing me and not leading to any valid legislative purpose." The Committee Chairman, in response, stated: "I will assure you that that is farthest from the intention of anybody on this committee, and this committee has never, for the mere sake of exposing, asked a question."

The Committee thereupon received in evidence copies of petitioner's college records showing that he transferred from the College of the City of New York to the University of Michigan in 1948 and that he had applied for employment in a Gary steel mill on June 23, 1949. After continued unproductive questioning, petitioner was asked:

> "Will you tell the committee, please, whether or not incidents came to your attention of the colonization of the steel unions in Gary by the Communist Party at any time prior to September 1957?" (Count 2.)

Following another refusal to answer, the Committee's counsel undertook to explain the purpose of the question.[6]

---

[6] "It has been testified here that colonization of young men in the middle of their educational courses in industry was a deep-seated plan of the Communist Party to strengthen itself within basic industry. The chairman's opening statement indicated that the activities of the Communist Party within basic industries was the subject of inquiry here.

. . . . .

"The statement was made here of the practice of the Communist Party in colonizing industry at Flint, Michigan; at the University of Colorado, which is at Fort Collins, Colorado [sic], where you now reside; and other places.

"In order to understand the full tactics of the Communist Party in its operations here in Gary, it is necessary the committee under-

Again petitioner declined to reply for the reasons he had given. In a similar vein, he refused to answer a good many other questions including the following two: .

"Were you a member of the Communist Party on the 23d day of June 1949, which is the date of application filed in your name for employment in Gary?" (Count 3.)

"Will you tell the committee whether or not in 1957 there were present in any of the steel unions at Gary, Indiana, persons who were known to you to have been colonizers of the Communist Party?" (Count 4.)

Petitioner was excused and various other witnesses were called, among them Joseph E. LaFleur who joined and had been active in the Communist Party from 1942 to 1952 at the request of the Federal Bureau of Investigation and who worked in the steel mills in Gary at times pertinent to this inquiry. He identified petitioner as a member of the Communist Party who with other young men participated in organizing Communist Party activities in Gary.

Upon report and recommendation by the Committee, petitioner was cited for contempt by the House of Representatives and was indicted and tried for refusing to answer the four questions designated above by count numbers. The sole government witness at the trial was the Committee's counsel who testified that the purpose of the hearings was to find out how serious the Communist propaganda infiltration was in basic industry, particularly in the steel industry. The Committee wanted information on this subject, he stated, to decide whether to

stand fully the extent of such practices, the full purposes of it, and the methods by which it is put into effect. That is the connective reasoning of the committee in asking the question."

amend various Acts of Congress and, in fact, members of the Committee did introduce several bills around the time of these hearings.[7] Prior to calling petitioner, he continued, the Committee had information that petitioner was a member of the Communist Party while at the University of Michigan, that he had applied for employment in Gary without disclosing his college education and that he had been employed in the steel industry in Gary.

The Committee Counsel emphasized that petitioner was summoned with the hope that he would cooperate and that the Committee believed petitioner had information about the colonization activities which had not been presented by any of the other witnesses. "We know nothing about the actual activities of the Communist Party in the steel plants in Indiana as of the time of this hearing, or shortly before. Mr. LaFleur, who did testify [at the Gary hearings], according to my recollection got out of the Communist Party in 1950. This witness, Mr. Yellin, as to whom we had testimony by several people, had been a member of the Communist Party at Michigan University, and had left there and come down and taken employment in Gary." [8]

---

[7] H. R. 2369, 86th Cong., 1st Sess., sponsored by Congressman Walter, to redefine "organize" as used in the Smith Act; H. R. 3693, 86th Cong., 1st Sess., introduced by Congressman Scherer, to permit the Federal Government to guard strategic defense facilities against espionage, sabotage and other subversion; H. R. 9352, 85th Cong., 1st Sess., an omnibus bill to amend the Internal Security Act of 1950; H. R. 8121, 86th Cong., 2d Sess., a bill to provide a security program for defense contractors and their employees.

[8] "Q. [By Mr. Rabinowitz.] . . . [W]ill you state what information you had, and what additional information you hoped to get?

"A. [By Committee Counsel.] As I was stating, the Committee had sworn testimony by two persons that Yellin was a member of the Communist Party at Michigan University. We had evidence

With respect to the denial of the request for an executive hearing, Committee Counsel testified as follows:

"Q. [By Mr. Rabinowitz.] Then why did you not comply with the request for an executive session?

"A. [By Committee Counsel.] . . . With the information that the Committee had regarding his membership, I would not have recommended—I will say this—I would not have recommended to the Committee, if they had asked, that he be heard in executive session.

"Q. Why not?

"A. Because we knew that he was a member of the Communist Party and he was in a position to give the Committee information, if he wanted to.

"Q. You knew he had been a member of the Communist Party?

"A. Yes.

---

that he had been transferred there from New York City; that he came from Michigan University down here, down to Gary, Indiana, and there became employed in the steel plants.

. . . . .

"We knew, from the statement made, by the information obtained from Mr. LaFleur, that Mr. Yellin had been active in Communist Party activities while employed by steel, the steel companies in Gary, and he so testified later, and it is in the record here.

"Now, with that information relating to Mr. Yellin, we felt certain that Mr. Yellin was in a position, if he would do so, to tell this Committee a great many things regarding the plan of the Communist Party to infiltrate the steel industry here, and to building up the Communist Party from its grass roots level, and just what the Communist Party plans were to make these bright young men leaders who did this thing of colonizing. He could have told us those things, from the position that he was in, if we were correct about his position, had he been willing to do so.

"But not a single witness who has been identified—who has been identified—as a colonizer in any of the places that you have mentioned, that I can recall, has ever admitted it, or ever testified that he had been a colonizer."

"Q. Many years before?

"A. Yes.

"Q. You didn't know whether he still was?

"A. If you had come and told me, now, this man has considerable information that he wants to give, that involves other people, and it ought to be thoroughly investigated before being made public, I would certainly have recommended that he be heard in executive session, but you never indicated that he was willing to do anything.

"Q. I did indicate that he wanted an executive session; though, didn't I?

"A. I say in the way of giving testimony.

"Q. And you did not feel that it was advisable to call an executive session for the purpose of determining whether he was prepared to give testimony, or not?

"A. My recollection is that he was sworn in as a witness, and you were sitting by his side, and at the beginning of the testimony you asked that we make a part of the record the telegrams which you had sent to the Committee. You didn't offer any suggestion then that he would give any information that would be of such a character that it ought to be taken in executive session to protect anybody while we were investigating to see whether the witness was telling the truth, or not."

Representative Walter of Pennsylvania, the Chairman of the House Un-American Activities Committee and of the Subcommittee which conducted the hearings in Gary, was called by petitioner. As far as he could recall, he did not know of petitioner's telegram asking for an executive session until the opening of the hearing in Gary. He pointed out that the telegram was not addressed to him and he had already departed for Gary when the telegram arrived. He stated that neither the Committee Counsel

nor the Staff Director had authority to pass on a request for an executive session and that when the matter of the telegram was raised at the hearings "it was too late then to raise any question that might have been raised by the telegram." When asked to explain, he said: "Well, the Committee already passed on the question of whether or not we would hear Mr. Yellin at a session when the purpose of calling him was discussed, and it was decided then that the rule with respect to an executive session was not applicable because the investigator—and I might say it was Mr. Collins, a former F.B.I. agent, who developed this entire matter, and we were willing to accept his story with respect to the proposed testimony." Mr. Collins' story, according to Chairman Walter, was "that the man was a known Communist; that he had been active in the international conspiracy, and that he had deceived his employer; and, furthermore, he came within the category of those people that we were experiencing a great deal of difficulty in finding out about with respect to the colonization." Congressman Walter further testified that petitioner's counsel at the hearing in Gary "didn't even there inform me as to the contents of the telegrams," which had not been sent to him, and also acknowledged that he had interrupted petitioner's counsel since "it is not the practice of the Committee to hear counsel, and that the function of counsel at Committee hearings is solely to confer with witnesses."

When asked to state the considerations which the Committee uses in determining whether to hold executive sessions, Chairman Walter explained: "This is usually done when the Committee is fearful lest a witness will mention the name of somebody against whom there is no sworn testimony, and in order to prevent the name of somebody being mentioned in public that we are not sure has been active in the conspiracy, at least that there isn't sworn testimony to that effect, we have an executive

hearing." He was aware that many witnesses refused to testify but "it is always worth a chance that somebody will testify . . . occasionally we are very pleasantly surprised at having somebody give us information that is of great value in the drafting of legislation."

Petitioner's challenge to his conviction is predicated upon, among other matters,[9] the claim that by the rules of the Committee he was improperly denied an executive session or at the very least a good-faith consideration of his request for one.

## I.

Since petitioner did not refuse to testify at the hearing on the ground that it was a public rather than a private session, it is my view that he is not entitled, at this late stage, to rely upon the Committee's alleged failure to apply its executive session rule to him.

As the courts have repeatedly held, to be available as a defense in a contempt of Congress trial, an objection must have been relied upon and asserted before the congressional committee *United States* v. *Bryan,* 339 U. S. 323, 332–333; *United States* v. *Fleischman,* 339 U. S. 349,

---

[9] Petitioner also raises the following questions:

(1) Did the public interest in securing answers to the questions which were the subject of the indictment outweigh the petitioner's rights under the First Amendment and the public interest in the protection of the free exchange of ideas?

(2) Was the investigation carried on by the Committee in violation of the Constitution and particularly of the First Amendment thereof?

(3) Did the trial court err in excluding certain proffered evidence on the issue of the balancing of public rights and private interests?

(4) Was the statute under which petitioner was convicted unconstitutionally vague?

(5) Were the questions which formed the basis of Counts 2 and 4 too vague to support a valid indictment?

(6) In the circumstances here shown, was there any proper legislative purpose in issuing a subpoena to petitioner?

352; *Barenblatt* v. *United States,* 360 U. S. 109, 123–125; *McPhaul* v. *United States,* 364 U. S. 372; *Eisler* v. *United States,* 83 U. S. App. D. C. 315, 170 F. 2d 273; *Hartman* v. *United States,* 290 F. 2d 460 (C. A. 9th Cir.); *United States* v. *Kamin,* 136 F. Supp. 791. This is no technical quibble, for there are compelling reasons to require an objection to be pursued before the Committee. It serves the administration of justice to have objections seasonably made in order that asserted errors may be corrected at the earliest possible time. As is the case in proceedings before a trial court, 1 Wigmore (3d ed. 1940) § 18, at 322, the objecting party is required to state his position and afford an opportunity to act upon his claim. "The practice of withholding all objection until time of trial is not helpful in protecting a witness' right to a valid [hearing]. It prevents correction of any error in that respect and profits only the witness who seeks a concealed defect to exploit." *United States* v. *Bryan, supra,* at 344 (concurring opinion). Accordingly, if possible damage to petitioner's reputation was a ground for his demanding an executive session under the Committee's rules and for his refusal to answer questions put to him by the Committee, "a decent respect for the House of Representatives . . . would have required that [he] state [his] reasons . . . . To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of its authority and an obstruction of its processes." *Id.,* at 332–333.

There is certainly nothing in petitioner's telegram [10] which makes out a substantial demand for an executive session. It contains simply the request itself and the un-

---

[10] The telegram read: "Undersigned represents Edward Yellin and Nicholas Busic. On their behalf I request executive session in lieu of open session. Testimony needed for legislative purposes can be secured in executive session without exposing witnesses to publicity. Victor Rabinowitz."

supported conclusion of petitioner's counsel, who, without knowing the extent or direction of the investigation, insists that petitioner's questioning could as well be conducted in executive session. There is no mention of the Committee rule or the particular grounds upon which the request was founded, nor are there any factual assertions to bring to light considerations which under the rule would call for the executive session, such as facts showing potential damage to his reputation. Indeed, it is difficult to understand how petitioner, at the time of the request, could have anticipated any ground for an executive session under the rule since he had no way of knowing what questions would be asked of him. It was not at all unlikely that petitioner would be called, like any other employee working in the steel mills at that time irrespective of Communist Party affiliation, to relate what instances of infiltration he observed while at work. See Question, *ante*, p. 129. Moreover, the wire was directed to one without authority to grant or deny an executive session and was sent only four days prior to the hearings and after the Subcommittee had departed for Gary.

At the opening of the hearing, Chairman Walter was entirely unfamiliar with the contents of the wire. And the exchange which occurred at that time, set out in the margin,[11] can hardly be construed as a denial of a pointed

---

[11] "Mr. TAVENNER. Will you state your name please, sir.

"Mr. YELLIN. Edward Yellin.

"Mr. TAVENNER. Will counsel accompanying the witness please identify himself for the record?

"Mr. RABINOWITZ. Victor Rabinowitz, New York.

"Mr. TAVENNER. Where and when were you born, Mr. Yellin?

"Mr. YELLIN. July 2, 1927, Bronx, New York.

"Mr. TAVENNER. Where do you now reside?

"Mr. YELLIN. Fort Collins, Colorado.

"Mr. SCHERER. I cannot hear the witness.

"The CHAIRMAN. Where? [*Footnote 11 continued on p. 138*]

request for an executive session based upon possible injury to Yellin's reputation. To be sure, Chairman Walter cut off petitioner's counsel immediately, but in terminating the discussion with counsel, the Chairman was simply making it clear that counsel's function before the Committee was to confer with the witness and not to argue with the Committee, which is in accordance with the Committee's rules. It was for the witness, with the help of his attorney, to answer the questions or to state his grounds for refusing to do so. The Chairman in no way indicated that the witness could not take up where counsel had left off.

---

"Mr. YELLIN. Fort Collins, Colorado.

"Mr. TAVENNER. How long have you lived at Fort Collins, Colorado?

"Mr. YELLIN. Since just about September of '57.

"Mr. TAVENNER. '50?

"Mr. YELLIN. September '57.

"Mr. TAVENNER. Where did you reside prior to—

"Mr. RABINOWITZ. Mr. Counsel, I wonder whether it would be possible to read into the record the exchange of telegrams between myself and the committee in connection with the witness's testimony. I would like to have it appear in the record.

"The CHAIRMAN. We will decide whether it will be made a part of the record when the executive session is held. Go ahead.

"Mr. RABINOWITZ. Mr. Chairman, I sent the telegrams because I wanted them to appear. I do not care whether they appear publicly or not. I do want it to appear that that exchange of telegrams occurred. I did not do it just to increase the revenue of the telegram company.

"The CHAIRMAN. Well, whatever the reason was, whether it has been stated or otherwise, it will be considered in executive session.

"Mr. RABINOWITZ. May I state—

"The CHAIRMAN. Do not bother. You know the privileges given you by this committee. You have appeared before it often enough. You know as well as anybody.

"Go ahead, Mr. Tavenner."

As the immediately ensuing questioning reveals,[12] petitioner had every opportunity to state his reasons for refusing to answer and every opportunity to confer with counsel. But the grounds which petitioner then gave for not answering the Committee's questions were based principally upon the First Amendment and were not grounded upon Rule IV–A, upon an alleged right to testify

[12] "Mr. TAVENNER. Mr. Yellin, where did you reside prior to September 1957?

"(The witness conferred with his counsel.)

"Mr. YELLIN. Mr. Tavenner, is that right?

"Mr. TAVENNER. Yes.

"Mr. YELLIN. Mr. Tavenner, if I may I would like to say just a few words before I answer that question to state my grounds as to what my position will be on answering questions.

"The CHAIRMAN. Just answer this question, not your grounds for answering questions that have not been asked.

"Mr. YELLIN. Then let me say that I feel that this question and this line of questioning will probably lead into certain areas of my freedom of beliefs, and I feel that I would like to say just a few words as to why I would not care to answer this question.

"The CHAIRMAN. It is not the case of whether you care to answer or not. It is a question of do you or do you not answer the question.

"(The witness conferred with his counsel.)

"Mr. YELLIN. Mr. Congressman, let me put it this way then: I will refuse to answer that question, and I would like the privilege—

"The CHAIRMAN. What is the question, Mr. Tavenner?

"Mr. TAVENNER. The question was where the witness lived prior to September 1957.

"The CHAIRMAN. And you feel honestly that if you answer the question of where you lived before September of last year, you might be confronted with a criminal prosecution, is that it?

"Mr. YELLIN. No. I didn't say that.

"The CHAIRMAN. You did not say that, but is that not what you mean?

"Mr. YELLIN. May I say what my objections are? If I can say what they are—

"The CHAIRMAN. Go ahead."

in private rather than in public or upon injury to his reputation.

More than once during the hearing the Committee took particular pains to ascertain the precise grounds upon which petitioner was refusing to testify. And on more than one occasion petitioner expanded and enlarged upon his reasons for not answering the Committee's questions. At no time, however, did he mention Rule IV–A or the matter of an executive session or specify how his reputation might be injured in a public hearing. Quite the contrary, when petitioner at one point asserted that he could not "see the purpose or the pertinency of asking me what they consider a known fact . . . it kind of appears to me as if this line of questioning is merely trying to create an impression and expose me for the sake of merely exposing me and not leading to any valid legislative purpose," Chairman Walter assured him that the Committee had never asked questions for the mere sake of exposing and then inquired: "And now I would like to ask you: What do you mean by exposing you? Exposing you to what?" Petitioner's answer was entirely unresponsi·e. He did not explain how he would be exposed or injured and instead launched upon a discussion of academic freedom. At another point, when petitioner said: "I don't like to have my loyalty questioned or my character questioned," Chairman Walter said: "Isn't this the best place to clarify the atmosphere? If you feel as you say you do, and I am sure that you do, is this not a great opportunity to eliminate whatever question might be in anybody's mind, particularly mine, about your activities?" Petitioner's answer was to decline to discuss himself. He did not accept the invitation to say how or in what manner his reputation would be unjustly injured by testifying in public.

Even if there could be sifted from this record a bona fide assertion of a right to an executive session and a re-

fusal to answer based upon that ground, petitioner consistently relied upon other grounds as well and it would sweep away much established law in this. Court to give his claim to an executive session any practical significance. Petitioner's central thesis and repeated reasons for not responding to questions put to him by the Committee were based upon the First Amendment. These grounds were firmly and clearly put and petitioner in no way indicated that an executive session would have made any difference in his willingness to answer questions.

The Court considered a similar situation in *United States* v. *Bryan,* 339 U. S. 323, in connection with the same congressional committee. There, the witness at her trial for contempt asserted that her failure to produce records at the hearing was excusable because there was not a quorum present, but that ground was held unavailable because she had relied upon other grounds at the hearing. "Testimonial compulsion is an intensely practical matter. . . . [T]he fact that the alleged defect upon which respondent now insists is, in her own estimation, an immaterial one, is clearly shown by her reliance before the Committee upon other grounds for failing to produce the records. She does not deny, and the transcript of the hearing makes it perfectly clear, that she would not have complied with the subpoenas no matter how the Committee had been constituted at the time." Explaining an analogous case, *Hale* v. *Henkel,* 201 U. S. 43, the *Bryan* Court noted that the witness in *Hale,* "having refused compliance for other reasons which the lower court could not remedy . . . could not later complain of its refusal to do a meaningless act—to grant him additional time to gather papers which he had indicated he would not produce in any event. Here respondent [Bryan] would have the Committee go through the empty formality of summoning a quorum of its members to gather in solemn conclave to hear her refuse to

honor 'its demands." *United States* v. *Bryan, supra,* at 334.[13]

Petitioner was represented at the hearing before the Committee by experienced counsel, the same counsel who represented the witness in the *Bryan* case. It is difficult to believe that if petitioner was in fact refusing to answer because he was called at a public hearing instead of an executive session, express reliance upon the Committee rule would not appear in the record along with the supporting reasons. Rather, it is far more likely that petitioner preferred to include among his several reasons for refusing to answer the ground that the Committee was seeking only to expose him for exposure's sake. See *Watkins* v. *United States,* 354 U. S. 178, 187, 200; *Sweezy* v. *New Hampshire,* 354 U. S. 234; *NAACP* v. *Alabama,* 357 U. S. 449. It would have weakened if not destroyed that ground if petitioner based his refusal to testify on the executive session ground and had been granted a private hearing. Quite plainly petitioner was seeking to keep his constitutional grounds intact.

It is no answer to say that this rule of diligence can be relaxed here because petitioner was not aware until the trial that the Committee might have ignored its own rules in deliberating upon whether or not to question him in private. The point is that if petitioner has any standing to complain about the manner in which the Committee acted, it must be because he asserted at the Committee hearing, when matters were still open to direct explanation and correction, that he would suffer unjust damage to

---

[13] See also *Loubriel* v. *United States,* 9 F. 2d 807, 808:

"The question is no less than whether courts must put up with shifts and subterfuges in the place of truth and are powerless to put an end to trifling. They would prove themselves incapable of dealing with actualities if it were so, for there is no surer sign of a feeble and fumbling law than timidity in penetrating the form to the substance."

his reputation by a public session and that he had a right under the rules of the Committee to have his reputational interest considered. Compare *Watkins* v. *United States,* 354 U. S. 178, and *Sweezy* v. *New Hampshire,* 354 U. S. 234, where the specific grounds sustained by the Court were vigorously asserted at the hearing. The Committee is obliged to make clear the demands which it makes upon the witness. *Quinn* v. *United States,* 349 U. S. 155. There surely must be a reciprocal obligation on the part of the witness to advise the Committee of the precise grounds for his silence.

## II.

In any event, however, the Committee did not, as petitioner contends, fail to apply its executive session rule to him.

Article I, § 5, cl. 2, of the Constitution provides that "Each House may determine the Rules of its Proceedings." The role that the courts play in adjudicating questions involving the rules of either house must of necessity be a limited one, for the manner in which a house or committee of Congress chooses to run its business ordinarily raises no justiciable controversy. *Field* v. *Clark,* 143 U. S. 649; *United States* v. *Ballin,* 144 U. S. 1; *Leser* v. *Garnett,* 258 U. S. 130, 137; cf. *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 143. However, when the application or construction of a rule directly affects persons other than members of the house, "the question presented is of necessity a judicial one." *United States* v. *Smith,* 286 U. S. 6, 33; *Christoffel* v. *United States,* 338 U. S. 84. Even when a judicial controversy is presented, the function of the courts is a narrow one. "With the courts the question is only one of power. The Constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable

relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. But within these limitations all matters of method are open to the determination of the house, and it is no impeachment of the rule to say that some other way would be better, more accurate or even more just." *United States* v. *Ballin, supra,* at 5; *United States* v. *Smith, supra.*

The Committee, pursuant to enabling resolutions of the House of Representatives in exercise of that rule-making power, promulgated its rules of procedure, number IV–A of which is in issue here:

"IV—Executive and Public Hearings:

"A—*Executive:*

"(1) If a majority of the Committee or Subcommittee, duly appointed as provided by the rules of the House of Representatives, believes that the interrogation of a witness in a public hearing might endanger national security or unjustly injure his reputation, or the reputation of other individuals, the Committee shall interrogate such witness in an Executive Session for the purpose of determining the necessity or advisability of conducting such interrogation thereafter in a public hearing.

"(2) Attendance at Executive Sessions shall be limited to Members of the Committee, its staff, and other persons whose presence is requested, or consented to by the Committee.

"(3) All testimony taken in Executive Sessions shall be kept secret and shall not be released or used in public sessions without the approval of a majority of the Committee."

Petitioner's claim is that in deciding to hold a public hearing in his case rather than to take his testimony in executive session, the Committee failed to give him the

full benefit of the rule because it did not consider whether "interrogation of a witness in a public hearing might . . . unjustly injure his reputation" and instead considered only injury to the reputation of other individuals. I find this contention wholly without substance.

My understanding of the testimony in the trial court is that when a witness before the Committee may implicate third persons about whom the Committee does not have reliable information, an executive session is held. In terms of Rule IV–A an executive session is afforded in these circumstances because an open hearing "might . . . unjustly injure . . . the reputation of other individuals." It is otherwise and a closed session is not required when the Committee has adequate and reliable information about the other individuals the witness may mention, for their reputation would not then be "unjustly injured" by revealing verified information in a public session.

The same considerations apply to the witness himself. "Certainly," as Mr. Tavenner testified, the rule operates for the benefit of the party testifying. See Opinion of the Court, *ante*, p. 116, n. 5. According to both Mr. Tavenner and Mr. Walter, Yellin was denied an executive session under the rule because he was a known Communist and the Committee had sworn testimony to this effect. The Committee believed the information furnished by its investigators about Yellin to be reliable. Measured against the plain terms of Rule IV–A, these facts did not call for a closed session. There was sworn testimony or other proof to back up the questions to be asked. There would be no "unjust injury" to the reputation of the witness Yellin. Publicly interrogating a witness if the Committee's foundation for its questions rests only upon suspicion or rumor falls within the area of unjust injury to reputation. But public revelation of the truth does not.

The foregoing appears to me to be the construction which the Committee placed upon its own rules and as so

construed it was applied here. It is true that in stating generally the considerations entering into the holding of an executive session, Mr. Walter said that private hearings are "usually" granted when third persons may be mentioned against whom there is no sworn testimony and that he did not know of any other considerations. But this general remark is, at best, ambiguous and is supplemented by his previous statements concerning the Committee's decision to hold a public hearing in petitioner's own case. That decision, according to his testimony, plainly was based upon the Committee's appraisal of its information about petitioner. Yellin was not denied an executive session because there was no indication of injury to third persons. The considerations underlying the denial were peculiar to Yellin himself. In the Committee's view, its information about him was reliable and adequate, his reputation would not be unjustly injured and he was therefore not entitled to a closed session. The Committee did not, as petitioner urges, fail to consider any element of its rule when it determined to interrogate him in a public hearing.

While the testimony is reasonably clear as to the Committee's construction and application of its own rule, if there were any doubt about the matter it is not our place to resolve every doubt against the Committee. "The presumption in favor of regularity, which applies to the proceedings of courts, cannot be denied to the proceedings of the Houses of Congress, when acting upon matters within their constitutional authority." *Barry* v. *United States ex rel. Cunningham,* 279 U. S. 597, 619. See also *McGrain* v. *Daugherty,* 273 U. S. 135, 179–180; *In re Chapman,* 166 U. S. 661, 670. Cf. *Tenney* v. *Brandhove,* 341 U. S. 367, 378. Due regard for the legislative branch of the Government requires a considerably clearer showing than what is offered here that the long-time Chairman of the Committee did not know his own rules when he

testified that the Committee had considered the request for an executive session and determined that the rule did not require it.

The Committee's construction of its own rules is entitled to great weight. *United States* v. *Smith,* 286 U. S. 6; *Christoffel* v. *United States,* 338 U. S. 84. "To place upon the standing rules of the [Congress] a construction different from that adopted by the [Congress] . . . is a serious and delicate exercise of judicial power." *United States* v. *Smith, supra,* at 48. Here, the Committee under its rule does not deem it to be unjust injury where the truth about the witness or à third person is brought out in a public hearing in pursuance of a valid legislative purpose. This reading of Rule IV–A is not bizarre, irrational or so out of keeping with history as to permit a court to ignore it because it would prefer a different construction or an entirely different rule. The House of Representatives has its own rule concerning executive sessions, Rule XI (m), which, according to the testimony at petitioner's trial and as contrasted with the rule of the Committee, has been construed by the House to afford no protection at all to the witness himself. Moreover, § 103 of the Revised Statutes, as amended, 2 U. S. C. § 193 provides that "[n]o witness is privileged to refuse to testify to any fact . . . upon the ground that his testimony to such fact . . . may tend to disgrace him or otherwise render him infamous." Whatever other problems may inhere in the rule of the Committee, of the House or in the statute, the Committee's construction of its own rule heralds no break with the tradition of the House or of Congress in affording privacy to a witness when the hearing may be a fishing expedition or an inquiry into mere rumor but permitting a public session when the matter to be brought out is both pertinent to a legislative purpose and nothing but the unvarnished truth. "The Constitution commits to the [House] the

power to make its own rules; and it is not the function of the Court to say that another rule would be better." *United States* v. *Smith, supra,* at 48.

Nor is there substance in petitioner's claim that the Committee erroneously failed to act upon the telegraphic request. Under the rule, all that is required is that the Committee consider whether to hold the session in an executive hearing. Cf. *United States ex rel. Accardi* v. *Shaughnessy,* 347 U. S. 260. Here, the Committee on its own motion, even before the telegram was transmitted, had given full consideration to whether petitioner should be questioned in private. Whatever would have been the prejudice resulting from disregarding the telegram and totally failing to consider whether the questioning should be conducted in secret, there is no room for complaint on this record since the Committee had already deliberated on the matter. Once it made its assessment, as it did here, it discharged any obligation which its own rules imposed.

### III.

If "testimonial compulsion is an intensely practical matter" and "every exemption from testifying or producing records thus presupposes a very real interest to be protected," *United States* v. *Bryan,* 339 U. S., at 332, much of this discussion is really beside the point. Petitioner was convicted for refusing to answer four questions, each refusal constituting a separate count in the indictment. He was found guilty on all four counts, his sentences to run concurrently. His conviction must stand if his refusal to answer any one of the questions was unjustified. *Claassen* v. *United States,* 142 U. S. 140, 147; *Hirabayashi* v. *United States,* 320 U. S. 81, 85; *Barenblatt* v. *United States,* 360 U. S. 109, 115. The first question which petitioner refused to answer was: "Mr. Yellin, where did you reside prior to September 1957?" Petitioner refused to respond because to him it was ob-

vious where "this line of questioning will probably lead" and, expressly disclaiming Fifth Amendment protection, declined to answer on First Amendment grounds.

Petitioner's conviction on Count 1 should stand quite independently as against the claim to an executive session for it is difficult indeed to ascribe any reality to the view that petitioner may not be compelled, in a public hearing held by a legislative committee in pursuit of information pertinent to a legislative purpose, to answer, or to refuse to answer, a question about his residence prior to 1957 because of danger to his reputation. Oversight of congressional committee procedures should not be based upon such frivolous grounds.

In my view, petitioner's executive session argument is totally without support, and therefore I dissent.