788 F.2d 705
 PORT OF JACKSONVILLE MARITIME AD HOC COMMITTEE, INC. and
Jacksonville Shipyards, Inc., Plaintiffs-Appellants,
v.
The UNITED STATES COAST GUARD and Jacksonville
Transportation Authority, Defendants-Appellees.
 No. 85-3178.
 United States Court of Appeals,
Eleventh Circuit.
 May 6, 1986.
 
 Thomas M. Baumer, Jacksonville, Fla., for plaintiffs-appellants.
 Robert C. Gobleman, James E. Cobb, Jacksonville, Fla., for Jacksonville Transp. Auth.
 John E. Lawlor, III, Asst. U.S. Atty., Jacksonville, Fla., for Coast Guard.
 Robert L. Klarquist, Appellate Sect./Land & Natural Resources Div. Jacques B. Gelin, Dept. of Justice, Washington, D.C., for U.S.
 Appeal from the United States District Court for the Middle District of Florida.
 Before GODBOLD, Chief Judge, KRAVITCH, Circuit Judge, and SIMPSON, Senior Circuit Judge.
 GODBOLD, Chief Judge:
 
 
 1
 This case was brought to challenge an action of the United States Coast Guard. Our review is governed by the Administrative Procedure Act, 5 U.S.C. Sec. 701 et seq.
 
 
 2
 The Port of Jacksonville Maritime Ad Hoc Committee and Jacksonville Shipyards appeal from the district court's summary judgment granted on motions of the United States Coast Guard and Jacksonville Transit Authority (JTA). We affirm.I. BACKGROUND
 
 
 3
 Congress has delegated to the Secretary of Transportation the power to approve the building of bridges over navigable waters of the United States. 33 U.S.C. Sec. 525 (1982). Pursuant to this delegation the secretary, through the Coast Guard, has promulgated regulations governing the issuance of bridge-building permits. In 33 C.F.R. 115.10(a) the Coast Guard has mandated that "[s]pecific time limitations are [to be] inserted in all [bridge-building] permits for the commencement of construction and completion thereof." The Coast Guard has formulated its own internal interpretation of the phrase "commencement of construction." Paragraph 1-C2.d-4 of its Bridge Administration Manual, COMDTINST-M16590.5 provides:
 
 
 4
 Commencement of construction is normally considered to be the date upon which work actually commences on the site of the proposed bridge, its approaches or ancillary works, including work in the water such as filling in, dredging, or other work authorized by the Corps of Engineers which is related to the bridge project. However, in cases where construction will be carried out under a construction contract with performance guaranteed by a bond or other surety, the date of the contract shall be the date of commencement.
 
 
 5
 This interpretation has never been published in the Federal Register.
 
 
 6
 On July 11, 1979 the Coast Guard granted JTA a permit to construct the "Dame Point" bridge across the St. John's River in Jacksonville, Florida.[1] The permit, as required by 33 C.F.R. 115.10(a), contained a date by which construction had to commence or else the permit would expire. This date was July 11, 1984, and the required completion date was July 11, 1988. For over four and one-half years after the issuance of this permit JTA took no action toward commencing construction. On March 7, 1984 JTA informed the Coast Guard that it intended to advertise a construction contract for the driving and test loading of one of the permanent piles of the bridge, to be located on the shore. In its letter the JTA requested that the Coast Guard "concur" in JTA's position that (1) the construction of this pile would constitute "commencement of construction" under the Coast Guard's interpretation of that phrase, and (2) that the award of a bonded contract for the driving and test loading of the one pile would satisfy the Coast Guard's interpretation. The Coast Guard responded to this inquiry with a letter on April 9 that merely paraphrased its interpretation of "commencement of construction." This response did not indicate whether either the construction of the pile or the award of a contract with a performance bond to construct the pile would fall within this interpretation.
 
 
 7
 On April 25 the Coast Guard placed a memorandum in its internal file on the St. Johns bridge noting that the pile would remain part of the permanent structure of the bridge and that "this event [the driving of the pile] would constitute timely commencement of bridge construction."
 
 
 8
 On June 11 JTA entered into a contract, with a performance bond, for the construction and test loading of the pile, and the Coast Guard was advised of the contract three days later. The pile was driven June 25, 16 days before the permit was to expire.
 
 
 9
 On July 10, 1984 appellants sent a letter to the Coast Guard asking it to state whether construction had commenced and, if so, whether various factors set out in the letter had been taken into account by the Coast Guard in making a determination that construction had commenced. The Coast Guard replied by letter of July 25, paraphrasing paragraph 1-C-2.d-4 of the Bridge Administration Manual and stating that the driving and pile load test constituted the commencement of construction.
 
 
 10
 The appellants filed suit in United States District Court, MD Florida, contesting the Coast Guard's determination that the driving of the test pile constituted commencement of construction. The district court granted the Coast Guard's and JTA's motions for summary judgment on the ground that the Coast Guard's action in determining that the driving of the piling was the commencement of construction was not arbitrary and capricious. In making this ruling the district court relied solely on the date, June 25, on which the pile actually was put into place. The court, like the Coast Guard, did not address the question of whether the execution of the June 11 contract fell within the Coast Guard's interpretation of "commencement of construction."
 
 II. DISCUSSION
 
 11
 A court reviewing a decision of an administrative agency must uphold the judgment of the agency unless a review of the administrative record discloses that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A); see also Bowman Transportation v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); Tackitt v. Prudential Insurance Co., 758 F.2d 1572, 1575 (11th Cir.1985). In employing this deferential standard of review, however, a court does not rubber stamp the action of the agency; rather, it must satisfy itself that the agency has "articulate[d] a 'rational connection between the facts found and the choice made.' " Burlington Truck Lines v. U.S., 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). We find that the agency has sufficiently articulated a rational basis for its action here.
 
 A. INTERNAL PROCEDURES
 
 12
 The appellants fault the Coast Guard for failing to properly apply the interpretation of "commencement of construction" in its internal Bridge Administration Manual. The Manual can be viewed as outlining a procedure to be followed in determining whether construction has commenced: look to see if there is "actual work" going on at the site or, if construction must be bonded, look to see whether there is a bonded contract for construction executed on or before the relevant date. The appellants contend that the Coast Guard was bound to follow this procedure, and that it failed to do so because it relied on evidence of "actual work" on the bridge site when it ought to have concerned itself solely with whether the bonded contract was truly a "contract" within the meaning of the Manual guideline.
 
 
 13
 As a general rule of administrative law "agencies are not required, at the risk of invalidation of their action, to follow all of their rules, even those properly classified as 'internal'." U.S. v. Caceres, 440 U.S. 741, 754 n. 18, 99 S.Ct. 1465, 1472 n. 18, 59 L.Ed.2d 733 (1979), citing American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 538-39, 90 S.Ct. 1288, 1292-93, 25 L.Ed.2d 547 (1970). A framework governing review of an agency's deviation from its own regulations is given in American Farm Lines, 397 U.S. at 538-39, 90 S.Ct. at 1292-93: determine whether the regulation was intended 1) to require the agency to exercise its independent discretion, or 2) to confer a procedural benefit to a class to which complainant belongs, or 3) to be a "mere aid" to guide the exercise of agency discretion. If the first or second,[2] invalidate the action; if the third, a further determination must be made whether the complainant has been substantially prejudiced. If he has, invalidate the action; if not, affirm. See Alamo Express, Inc. v. U.S., 613 F.2d 96, 97-98 (5th Cir.1980); Barnes Freight Line, Inc. v. ICC, 569 F.2d 912, 921 (5th Cir.1978); EEOC v. Airguide Corp., 539 F.2d 1038, 1042 & n. 6 (5th Cir.1976).
 
 
 14
 This framework has been principally applied to deviations by agencies from their published regulations,[3] but insofar as it restricts the scope of review,[4] it applies a fortiori to agency deviations from internal guidelines not published in the Federal Register.[5]
 
 
 15
 There is no indication that the Bridge Manual provision at issue was intended to extend a benefit to anyone. Although the provision tells Coast Guard personnel how to go about determining a fact,[6] it does not direct them to give notice to anyone, or to give anyone an opportunity to be heard. Cf. Alamo Express Co. v. U.S., 613 F.2d 96, 97-98 (5th Cir.1980) (ICC practice, pursuant to regulation, of "offering telephonic notice and opportunity to comment" to licensed carriers prior to granting emergency license to competing carrier, held to "involve the extension of important procedural benefits").
 
 
 16
 Therefore the Coast Guard's action should be upheld unless the appellants have alleged, at the very least,[7] facts showing substantial prejudice. No such facts have been alleged. Even if the Coast Guard's scrupulous adherence to the Bridge Manual procedure had led it to conclude that construction had not timely commenced, the appellants would at most have been entitled to comment at a reissuance hearing.[8] There is no allegation that the permit would not be reissued if it had been found to have expired. Nor is there any allegation that because of changed conditions the impact of the bridge upon navigation differs from what was found in the proceedings that culminated in the initial issuance of the permit. Nor is there any allegation that appellants will suffer economic or other injury should the bridge go forward.
 
 B. RELEVANT FACTORS
 
 17
 Agency action that has been taken without due regard to "relevant factors" should be reversed. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). Appellants insist that this is such a case. The statute, the General Bridge Act of 1946, does not require time limits within which construction of a bridge must be either begun or finished and it does not suggest what factors would be relevant to determining whether a time-of-commencement limit has expired. The regulation requiring time limits in bridge permits is likewise unhelpful. Navigable waters are mutable, and common sense tells us that a bridge plan that is consistent with navigational needs now may not be so later. Nothing in the regulations suggests why a time-of-commencement limit, as well as a time-of-completion limit, is necessary.[9] The idea is surely to provide an incentive to get started and to allow review of slow-starting projects before great costs have been incurred.
 
 
 18
 The appellants urge that the Coast Guard was required to look beyond the two factors mentioned in the Bridge Manual, and to consider such matters as these:
 
 1. As of July 11, 1984:
 
 19
 --the final plans and design drawings for the Dame Point Bridge had not been approved;
 
 
 20
 --there were no funds available for construction of the bridge;
 
 
 21
 --the Cabinet of the State of Florida had not approved construction of the bridge;
 
 
 22
 --the Cabinet of the State of Florida had not approved the issuance of bonds necessary to finance construction of the bridge;
 
 
 23
 --there was not a contract for the construction of the bridge in its entirety.
 
 
 24
 2. Whether there were any industry standards relating to the definition of "commencement of construction" and how those standards defined the term; and
 
 
 25
 3. Whether and how the Coast Guard on any other occasions has interpreted the term "commencement of construction". Appellants' Brief at 19-20.
 
 
 26
 Assuming that the facts are such as this list alleges, there is nothing in the statute or regulations that requires the Coast Guard to make so wide-ranging inquiry in order to determine whether construction has commenced. The concern underlying the permit procedure is to assure that navigation is not unduly impeded by bridges or other obstructions. See 33 C.F.R. Sec. 144.10 (1984). Even in the initial permit procedure this concern does not require a determination that a bridge project undertaken by a public authority is desirable, affordable, practical, wise, politically do-able or designed in any particular fashion so long as the project if built will not have an unacceptable impact on navigational needs. See 33 C.F.R. Sec. 155.50 (1984). The Coast Guard has interpreted its self-imposed time limitations regulation in a way that allows it to make a relatively rough-and-ready determination whether construction has commenced. This interpretation is due to be upheld if it is reasonable. See, e.g., Griggs v. Duke Power, 401 U.S. 424, 433-34, 91 S.Ct. 849, 854-55, 28 L.Ed.2d 158 (1971). We hold that it is.
 
 
 27
 In sum, the Coast Guard's decision "is entitled to a presumption of regularity." Overton Park, 401 U.S. at 415, 91 S.Ct. at 823. This presumption does not "shield [its] action from a thorough, probing, in-depth review," id., but appellants' objections do not suffice to overcome the presumption here.
 
 
 28
 AFFIRMED.
 
 
 
 [1]
 A recitation of the events surrounding the issuance of this permit is contained in Port of Jacksonville Maritime Commission v. Hayes, 485 F.Supp. 741, 742-43 (M.D.Fla.), aff'd, 620 F.2d 567 (5th Cir.1980). In that case the Coast Guard's decision to issue the permit was upheld
 
 
 [2]
 Taylor v. District Engineer, U.S. Army Corps of Engineers, 567 F.2d 1332 (5th Cir.1978), cited by appellants, falls into this category. See also U.S. v. Joseph G. Moretti, Inc., 478 F.2d 418 (5th Cir.1973)
 
 
 [3]
 "Substantive rules of general applicability ... and statements of general policy or interpretations of general applicability ..." are to be published in the Federal Register. See 5 U.S.C. Sec. 552(a)(1) (1984). "Except to the extent that a person has actual and timely notice thereof, a person may not in any manner be ... adversely affected by ... a matter required to be published in the Federal Register and not so published." Id. The Bridge Administration Manual has not been published in the Federal Register, nor do appellants contend that it should have been
 
 
 [4]
 It is not clear that a showing of substantial prejudice to the complaining party is a sufficient ground for invalidating an agency deviation from an internal guideline. Since there are no allegations of substantial prejudice in this case, however, we do not reach this issue. Cf. Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974) ("where the rights of individuals are affected agencies must follow their own procedures ... even where the internal procedures are possibly more rigorous than otherwise would be required."--speaking of a procedural rule set out in "an internal-operations brochure")
 
 
 [5]
 One commentator has faulted Morton v. Ruiz for departing from American Farm Lines by failing to require a showing of substantial prejudice. See Davis, Administrative Law Surprises in the Ruiz Case, 75 Colum.L.Rev. 823, 839-40 (1975). We read Morton v. Ruiz differently. The internal guideline at issue there "declared that all directives that 'inform the public of privileges and benefits available' and of 'eligibility requirements' " be published. Morton v. Ruiz, 415 U.S. at 235, 94 S.Ct. at 1074. The guideline clearly was intended to confer a procedural benefit and therefore, under the American Farm Lines framework, no inquiry into substantial prejudice was necessary
 
 
 [6]
 The Bridge Manual states two standards for determining when construction has commenced: actual work on the site and formation of a bonded contract for construction. Although the Coast Guard letters and memorandum seem to look only at actual work, the administrative record also contains evidence of a bonded contract to drive the test piling. The Coast Guard was required to make, at most, a "brief statement of the grounds" of its decision not to declare the bridge permit expired. See 5 U.S.C. Sec. 555(e); Overton Park, 401 U.S. at 417, 91 S.Ct. at 824. Even assuming that the Coast Guard has bound itself to separately consider the date and extent of the bonded contract as relevant factors, the presence of a copy of the contract in the administrative record defeats the appellants' contention that the contract was not considered in this informal adjudicatory proceeding. See Overton Park, 401 U.S. at 417, 420, 91 S.Ct. at 824, 825
 
 
 [7]
 See note 4, supra
 
 
 [8]
 A conjunction of lost revenue and postponement of "opportunity to offer input" was held to constitute "substantial prejudice" in Alamo Express, 613 F.2d at 98, but there was no indication that postponed input alone was substantial prejudice
 
 
 [9]
 The regulation is probably modelled on the predecessor statute, the Bridge Act of 1906, 33 U.S.C. Sec. 496, which imposes a three-year time-of-commencement limit in the absence of a contrary provision in the congressional act approving construction of the specific project