91 F.3d 143
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
EPI CORPORATION, doing business as Briarwood Nursing and
Convalescent Center, Plaintiff-Appellant,
v.
Shirley S. CHATER, Commissioner of Social Security,
Defendant-Appellee.
 No. 95-5069.
 United States Court of Appeals, Sixth Circuit.
 July 30, 1996.
 
 Before: NORRIS and MOORE, Circuit Judges, and MILES, District Judge.*
 MOORE, Circuit Judge.
 
 
 1
 Plaintiff-Appellant EPI Corporation, doing business as Briarwood Nursing & Convalescent Center ("Briarwood") appeals the district court's order affirming the decision of Defendant-Appellee Shirley S. Chater ("Chater")[1] not to renew Briarwood's Medicare provider agreement. For the reasons that follow, we affirm the district court's judgment.
 
 
 2
 * EPI Corporation owns and operates nursing homes, including Briarwood, which is a 78-bed nursing home located in Louisville, Kentucky. Until September 1989, 39 of Briarwood's beds were certified for participation in the Medicare and Medicaid programs as a skilled nursing facility ("SNF").
 
 
 3
 In order to participate in the Medicare program, SNFs had to comply with certain federal regulations, which were called "conditions of participation" in 1989.[2] Each provider agreement for an SNF lasted for 12 months, and compliance was required to be proven each year. Compliance with the conditions of participation was assessed by state survey agencies, which conducted surveys under contract with the United States Department of Health and Human Services ("HHS"). While conducting the surveys, state agencies used federal forms and were subject to federal regulations. After conducting surveys, state agencies reported their findings on Medicare compliance to the Health Care Financing Administration ("HCFA"), a division of HHS. Based upon the state agency's recommendations, HCFA decided whether the particular SNF was in compliance with the conditions of participation. If a particular SNF was not in compliance, HCFA could refuse to renew the SNF's Medicare provider agreement. The SNF that was deemed not to be in compliance could submit a plan of correction or a credible allegation of compliance, in which case the HCFA could decide to renew the SNF's Medicare provider agreement.
 
 
 4
 A survey team from the Kentucky Cabinet of Human Resources conducted a survey of Briarwood's facility on June 6-8, 1989. The survey team toured the facility, observed patients, reviewed Briarwood's records, and monitored nursing services. At the end of the survey, the survey team informed Briarwood during an "exit conference" that it had found several deficiencies with regard to Briarwood's care and facility. Within 10 days of the exit conference, the survey team provided Briarwood with a Statement of Deficiencies ("SOD"), in which the survey team detailed the deficiencies it had found at Briarwood and its finding that Briarwood was out of compliance with three conditions of participation. Briarwood responded to several of the deficiencies with applicable plans of correction, but responded to others simply by disagreeing either with factual findings of the survey team or that the facts as found constituted a deficiency.
 
 
 5
 Based on the survey results, HCFA refused to renew Briarwood's Medicare provider agreement, and Briarwood was not reimbursed for care provided to Medicare patients after September 30, 1989. Briarwood then appealed HCFA's decision. After an evidentiary hearing, an ALJ affirmed HCFA's decision not to renew Briarwood's Medicare provider agreement. The ALJ found that the survey team generally followed the "intent and mandates" of the HHS regulations in conducting the survey, and that Briarwood received sufficient notice of the deficiencies. The ALJ also found that the evidence supported HCFA's determination that Briarwood was not in substantial compliance with three Medicare conditions of participation, that Briarwood did not properly respond to the SOD, and that HCFA properly refused to renew Briarwood's provider agreement. Briarwood, after another survey, apparently was recertified as a Medicare provider in November 1990. Letter from Patricia Campbell, Joint Appendix at 78. Thus, Briarwood sought relief pertaining to the period during which Briarwood was not certified to participate in the Medicare program.
 
 
 6
 Briarwood then appealed to the HHS Appeals Council, which affirmed the HCFA's decision not to renew Briarwood's Medicare provider agreement. The Appeals Council found that the survey team failed to follow the procedural regulations in two main respects. First, the survey team did not complete the Survey Report Form ("SRF") before the exit conference, as impliedly required by 42 C.F.R. § 488.110. Instead, the survey team relied on its tour notes and on other preliminary reports at the exit conference, and thus was unable to provide "data prefix tags" to identify the deficiencies at the exit conference. Second, the survey team did not provide "resident identifiers" in the SOD that was sent to Briarwood. However, the Appeals Council found that the survey conducted at Briarwood met the substance of the procedural regulations, and that Briarwood's ability to respond to the SOD was not prejudiced by the survey team's procedural lapses. The Appeals Council also found that Briarwood was not in compliance with the nursing services, infection control, and governing body/management conditions of participation, and that HCFA's decision not to renew Briarwood's Medicare provider agreement was proper.
 
 
 7
 Briarwood next appealed the Appeals Council's decision to the district court. The district court affirmed the Appeals Council's decision, because it found that the survey team's failure to comply with the applicable regulations would not invalidate the agency's actions absent a showing of substantial prejudice, and that Briarwood failed to make such a showing. The district court went on to determine that the agency's deficiency findings were supported by substantial evidence. Briarwood finally appealed to this court.
 
 II
 
 8
 Briarwood argues that the survey team failed to comply with HHS regulations in the following respects.[3] First, Briarwood argues that the survey team members had not received the training required by the regulations before conducting the survey at Briarwood. Second, Briarwood argues that the survey team members violated the regulations by failing to fill out the SRF before the exit conference, which resulted in an assessment of deficiencies that was not based on the required analysis of observations and an exit conference that did not provide a "meaningful" opportunity for Briarwood to present its views.
 
 
 9
 Briarwood's argument that the survey team members had not received proper training is without merit. The only regulation regarding surveyor qualifications in effect at the time of the survey was 42 C.F.R. § 488.110(o), which required that at least one member of the survey team be a registered nurse. Three of the five Briarwood survey team members were registered nurses, so the survey team actually exceeded the qualifications imposed by the regulations. Although some of the team members had not received federal training at the time of the Briarwood survey, the statute that required such training did not become effective until October 1990, after the Briarwood survey was conducted. See 42 U.S.C.A. § 1395i-3(g)(2)(E) (1990 version in main volume). Briarwood admits as much in its brief to this court. Appellant's Brf. at 28 ("Although, as earlier noted, the effective date of OBRA '87 was October 1, 1990, it appears that HCFA already had implemented, or attempted to implement, the provisions concerning the survey teams"). HHS cannot be bound by a regulation that has not yet become effective, and cannot be faulted because it had not yet completing training that was required by a prospective regulation. Thus, we reject Briarwood's argument that the survey team members were improperly trained.
 
 B
 
 10
 Briarwood also argues that the survey team was required to fill out the SRF before the exit conference. The record shows that the SRF was not completed at the time of the exit conference, given the testimony of the survey team members that they relied on their tour notes and other forms, not the SRF, at the exit conference.
 
 
 11
 The SOD did not have to be completed before the exit conference. 42 C.F.R. § 488.110(j) ("In accordance with your Agency's policy, present the Statement of Deficiencies, form HCFA-2567, on site or after supervisory review, no later than 10 calendar days following the survey."). However, the timing requirements for the SRF were not so clear. The regulations did not state explicitly that the SRF had to be completed before the exit conference, although 42 C.F.R. §§ 488.110(i) and (j) implied that the SRF was to be completed before the exit conference. Section 488.110(i) stated:
 
 
 12
 (1) ... Be sure to transfer to the Survey Report Form data from the tour, drug pass observation, dining area and eating assistance observation, as well as in-depth review of the sample of residents. Transfer only those findings which could possibly contribute to a determination that the facility is deficient in a certain area. Meet as a group in a pre-exit conference to discuss the findings and make conclusions about the deficiencies....
 
 
 13
 (2) ... Analyze the findings on the Survey Report Form for the degree of severity, frequency of occurrence and impact on delivery of care or quality of life....
 
 
 14
 The regulation's discussion of a pre-exit conference implies that the SRF was to be completed before the pre-exit conference, which had to be held before the exit conference. Thus, it appears that the Briarwood survey team may have violated the implications of the procedural regulations when it failed to complete the SRF prior to the exit conference.
 
 
 15
 Briarwood argues that this apparent violation of agency regulations requires the invalidation of the entire survey. Briarwood argues that HHS was bound by its own published regulations, and that the failure to follow the regulations requires reversal in this case because the regulations conferred procedural benefits upon Briarwood. We disagree.
 
 
 16
 The survey team's failure to complete the SRF before the exit conference does not require us to invalidate HHS's decision not to renew Briarwood's Medicare provider agreement. The Supreme Court has stated that agencies are bound by procedural regulations and internal rules. Morton v. Ruiz, 415 U.S. 199, 235 (1974) ("[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures"); Yellin v. United States, 374 U.S. 109, 123-24 (1963); Vitarelli v. Seaton, 359 U.S. 535, 539-40 (1959); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 268 (1954). However, the Supreme Court also has stated that agency promulgations are not always binding. Lyng v. Payne, 476 U.S. 926, 937 (1986) ("... not all agency publications are of binding force"); Schweiker v. Hansen, 450 U.S. 785, 789 (1981) (SSA Claims Manual, an internal document, does not bind agency).
 
 
 17
 In American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 538-39 (1970), the Supreme Court held that an agency's failure to follow its own rules and regulations do not always require reversal of the agency's actions. The Court determined that an agency's failure to follow regulations promulgated for the primary purpose of providing the necessary information for the agency's decision did not require reversal of the agency's decision absent a showing of substantial prejudice by the affected party. 397 U.S. at 538-39. The rules at issue in American Farm Lines were formal regulations that had been published in the Code of Federal Regulations. Id. at 534. The Court distinguished agency violations of rules, such as those at issue in Vitarelli, that were "intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion." Id. at 538-39. The Court also distinguished agency violations of rules that required an agency to exercise independent discretion, such as those in Accardi and Yellin. Id. at 539.
 
 
 18
 The Supreme Court cases that required agencies to follow their own regulations are distinguishable from Briarwood's situation. Accardi involved a determination that the agency had failed to exercise the discretion that it was required by regulation (and by statute) to exercise. 347 U.S. at 268. Clearly, an agency's failure to make a decision required by its governing statute is illegal. Vitarelli involved an agency's failure to follow regulations that required notice of the charges against the party and the right to cross-examine witnesses, which are regulations with constitutional dimensions. 359 U.S. at 540. The Vitarelli Court even distinguished the case before it from one involving "mere consideration of procedural irregularities," by noting that the failure to follow the regulations severely constrained the party's ability to defend against the charges. Id.
 
 
 19
 In Yellin, the Supreme Court allowed a defendant to assert a defense to a contempt of Congress charge based upon a congressional committee's failure to follow its own rules. 374 U.S. at 123-24. The Court did not reverse the committee's decision based upon a rules violation. Finally, Morton involved a violation of an agency's internal regulation that required notice of program qualifications to be published in the federal register. 415 U.S. at 235. The agency's rule clearly was designed to confer a benefit upon regulated parties because it provided the only notice those parties would receive of eligibility for and limits upon available benefits. Moreover, Morton has been limited by Schweiker, which held that internal agency procedures do not bind the agency. Schweiker, 450 U.S. at 789. See also Fano v. O'Neill, 806 F.2d 1262, 1264 n. 1 (5th Cir.1987) (describing limitation of Morton by Schweiker and Lyng ).
 
 
 20
 This court has followed American Farm Lines by adopting a substantial prejudice test in cases in which an agency is alleged to have departed from statutes or regulations that are intended to govern internal agency procedures. Thus, an agency's decision will not be reversed for failure to comply with procedural regulations absent a showing of substantial prejudice to the complaining party. Baumgardner v. Secretary, United States Dep't. of Housing & Urban Development, 960 F.2d 572, 577-78 (6th Cir.1992) (agency's failure to follow statutory notice provision did not require reversal when complaining party not substantially prejudiced); Connor v. United States Civil Service Comm'n, 721 F.2d 1054, 1056 (6th Cir.1983) ("... an agency's violation of its procedural rules will not result in reversible error absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses"); Bates v. Sponberg, 547 F.2d 325, 330 n. 6 (6th Cir.1976) (noting that federal agencies have been permitted to depart from their own regulations where regulations were intended to govern internal agency procedures and not to protect the interests of the objecting parties). These cases do not distinguish between statutes, regulations, and internal agency rules, but instead apply the substantial prejudice test to all agency procedural violations, as long as the procedures were intended primarily to govern internal agency procedures. See also Port of Jacksonville Maritime Ad Hoc Committee, Inc. v. United States Coast Guard, 788 F.2d 705, 709 (11th Cir.1986) (noting that American Farm Lines framework for reviewing agency departures from regulations had been applied primarily to published regulations, but that it should also apply to agency deviations from internal guidelines).
 
 
 21
 One purpose of the HHS procedural regulations governing the survey process is to provide procedural protections to regulated providers. See Town Court Nursing Center, Inc. v. Beal, 586 F.2d 266, 277-78 (3d Cir.1978) (survey process provided procedural safeguards to Medicare provider, so pretermination hearing not required). However, the regulations were adopted primarily to measure providers' actual performance in patient care so that HHS could determine whether the patients actually were receiving the quality of care required by the Medicare and Medicaid statutes. See Estate of Smith v. Heckler, 747 F.2d 583, 590-91 (10th Cir.1984) (HHS required to promulgate survey process regulations that are patient-oriented, so that agency could be informed whether patients actually were receiving the quality care required by the Medicaid Act). Moreover, the particular regulation at issue, which implies but does not explicitly require that the SRF and its accompanying analysis should be completed before the exit interview, clearly is aimed at assisting the agency representatives in synthesizing the information gathered during the survey, not at providing any procedural benefit to the provider. Because the regulation in this case is intended primarily to assist the agency in gathering and processing information needed to reach its decision, the substantial prejudice test applies.
 
 
 22
 The Appeals Council and the district court both found that Briarwood could not show substantial prejudice from the agency's failure to complete the SRF before the exist conference because Briarwood's response to the SOD indicated that Briarwood had sufficient notice of the deficiencies to make a proper response. These rulings properly apply the substantial prejudice standard, and Briarwood points to nothing to indicate that these rulings were incorrect. See American Farm Lines, 397 U.S. at 538-39 (no substantial prejudice from agency failure to obtain information required by regulation when sufficient information provided to allow precise and informed responses from affected parties). Because Briarwood cannot show substantial prejudice resulting from the agency's failure to complete the SRF before the exit conference, we will not invalidate HHS's decision on this basis.
 
 III
 
 23
 This court reviews HHS's decision to determine whether it is supported by substantial evidence and whether HHS used the proper legal standards in reaching its decision. See Brainard v. Secretary of Health and Human Services, 889 F.2d 679, 681 (6th Cir.1989) (per curiam). This court's review is limited to an examination of the record, and does not include reviewing evidence de novo, making credibility determinations, or weighing the evidence. Id. The district court's decision is reviewed de novo, and is not entitled to any particular deference, since the appeals court is as capable as the district court of reviewing the administrative record. See Crum v. Sullivan, 921 F.2d 642, 644 (6th Cir.1990) (district court conclusion reviewed de novo, and agency decision reviewed by court of appeals as if it were the first reviewing court); Memorial Hospital/Adair County Health Center, Inc. v. Bowen, 829 F.2d 111, 116 (D.C.Cir.1987) (district court decision reviewed without deference because the findings of fact were made by the agency).
 
 
 24
 Although Brainard involved a determination of eligibility for Social Security disability insurance benefits, the same judicial standards of review apply to HHS's decision in this case because the provision of the Medicare Act that permits review of non-renewal decisions incorporates the judicial review provision found in the disability insurance benefits portion of the Social Security Act. 42 U.S.C. § 1395cc(h), the Medicare Act's review provision, provides that "... an institution or agency dissatisfied ... with a determination described in subsection (b)(2) of this section shall be entitled ... to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title." 42 U.S.C. § 1395cc(b)(2), as referred to in subsection (h), involves determinations by HHS that providers are not in compliance with the requirements for participation in the Medicare program. 42 U.S.C. § 405(g), also referred to in subsection (h), is the judicial review provision of the portion of the Social Security Act providing for old-age, survivors, and disability insurance benefits.
 
 
 25
 "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brainard, 889 F.2d at 681. The record must be reviewed " 'as a whole,' including 'whatever in the record fairly detracts from its weight.' " Mullen v. Bowen, 800 F.2d 535, 545-46 (6th Cir.1986) (en banc) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971)).
 
 
 26
 Briarwood was found to be out of compliance with three conditions of participation. First, Briarwood was found to be out of compliance with the nursing services condition of participation, which states:
 
 
 27
 The skilled nursing facility provides 24-hour service by licensed nurses, including the services of a registered nurse at least during the day tour of duty 7 days a week. There is an organized nursing service with a sufficient number of qualified nursing personnel to meet the total nursing needs of all patients in the facility.
 
 
 28
 42 C.F.R. § 405.1124. See also 42 C.F.R. § 405.1124(c) (requiring "24-hour nursing services which are sufficient to meet total nursing needs"). The Appeals Council found that Briarwood was out of compliance with this condition of participation because Briarwood was unable to provide the patients' total nursing needs, and because Briarwood failed to meet the patient care plan requirements. The Appeals Council based its findings on Briarwood's failure to identify and implement needed changes in patients' care plans, its failure to implement a bowel and bladder retraining program, and its failure to change a dressing on an infected wound for four days.
 
 
 29
 These findings of the Appeals Council are supported by substantial evidence. The record contained evidence that the staff failed to seek changes in care orders that were not working. For example, survey team members testified that a "space boot," which was supposed to take pressure off a patient's ulcerated heel, was not on the patient at all times per the doctor's orders. Houchen Testimony, Administrative Record ("AR") at 122-23. Briarwood's excuse was that the patient kicked the boot off, and that staff replaced it when they found it off. AR at 123-24. The survey team members testified that Briarwood's response was inadequate for several reasons. First, the response failed to ensure that the doctor's orders, which required the boot to remain in place at all times, actually were carried out. Second, the staff had failed to consult the patient's doctor to inform him that the treatment could not be carried out and to obtain an alternative treatment. AR at 125-26, 236-38. One of the survey team members testified about an easily accomplished alternative treatment, which involved the use of sheepskin that could be taped to the patient's foot, that the Briarwood staff apparently had never attempted to implement. AR at 238. The survey team members pointed out that Briarwood's failure to ensure that doctors' orders were followed indicated an inability to provide the care needed by the patients. The survey team members' conclusions are reasonable and are supported by the evidence of record.
 
 
 30
 The record also contained testimony from survey team members about Briarwood's failure to change a dressing on an infected wound for at least two days. AR at 128-30. Although Briarwood argued that the dressing was not changed due to doctor's orders, Briarwood's strained interpretation of the doctor's orders to require a dirty dressing to remain on a wound that was exuding pus defies common sense. If Briarwood staff had indeed believed that the doctor had given such an order, common sense would dictate that they discuss such an order with the doctor to clarify or change it.
 
 
 31
 Second, Briarwood also was found to be out of compliance with the infection control condition of participation, which states:
 
 
 32
 The skilled nursing facility establishes an infection control committee of representative professional staff with responsibility for overall infection control in the facility. All necessary housekeeping and maintenance services are provided to maintain a sanitary and comfortable environment and to help prevent the development and transmission of infection.
 
 
 33
 42 C.F.R. § 405.1135. The Appeals Council found that Briarwood was out of compliance with this condition of participation based upon its staff's poor handling of possibly contaminated linens, which indicated that the infection control committee was not functioning effectively, and the fact that the record as a whole indicated that Briarwood's staff had "an alarming disregard for basic infection control principles." Appeals Council Decision at 30.
 
 
 34
 The record evidence substantially supports this conclusion. The survey team members testified to several incidents of poor handling of linens. Although Briarwood sought to minimize the incidents by pointing out that the reported incidents occurred in a small percentage of the times linen was handled during the day, the errors, which were plain to even a lay person, and the staff's reactions upon confrontation by the survey team, justified the survey team in concluding that the incidents resulted from a systemic lack of training and were therefore more widespread than observed. The record also contained testimony about poor isolation techniques, which also provided a substantial basis for the Appeals Council's decision that infection control problems were widespread at Briarwood. Houchen Testimony, AR at 136-40.
 
 
 35
 Finally, Briarwood was found to be out of compliance with the governing body and management condition of participation, which states:
 
 
 36
 The skilled nursing facility has an effective governing body, or designated persons so functioning, with full legal authority and responsibility for the operation of the facility. The governing body adopts and enforces rules and regulations relative to health care and safety of patients, to the protection of their personal and property rights, and to the general operation of the facility.
 
 
 37
 42 C.F.R. § 405.1121. The Appeals Council found that Briarwood was not in compliance with this condition of participation because the deficiencies noted throughout the survey indicated a systemic failure to guide and monitor staff operations, and because Briarwood's responses to the survey indicated a lack of commitment to curing the facility's problems. The deficiencies cited in support of this failure to meet the condition of participation included a failure to protect patient rights by bathing patients without closing doors or covering the patients, and a failure effectively to train staff.
 
 
 38
 These deficiency findings are adequately supported by the evidence in the administrative record. The survey team members testified that they had seen patients while they were being bathed, and that such sightings were an affront to the patient's dignity and a violation of the patient's rights. In its responses to the SOD, Briarwood challenged the deficiencies by pointing out that its staff had been trained on the particular issue. However, the number of incidents in which the training had failed justified the Appeals Council's findings that Briarwood's training was ineffective.
 
 
 39
 Briarwood challenged some of the survey team members' observations as unsupported by the survey team's notes, and challenged the assessment of certain deficiencies based on Briarwood's reading of the applicable standards. Briarwood also presented testimony by some of its staff, which provided reasonable explanations for some of the episodes observed by the survey team members. Briarwood's challenges were supported by some evidence and testimony. Nonetheless, the HHS witnesses' testimony was substantial and credible, and the Appeals Council certainly was entitled to rely upon such evidence.
 
 
 40
 Therefore, the Appeals Council's decision that Briarwood was not in compliance with three of the Medicare conditions of participation was supported by substantial evidence. Thus, we AFFIRM HHS's decision not to renew Briarwood's Medicare provider agreement.
 
 
 
 *
 Honorable Wendell A. Miles, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. 103-296, 108 Stat. 1464, the Commissioner of Social Security, Shirley S. Chater, is substituted as defendant for the Secretary of Health & Human Services, who was the original named defendant in this case
 
 
 [2]
 The Medicare statute and regulations have been altered several times since 1989. All references to the statute and regulations, unless otherwise noted, will be to the statute and regulations in effect in June 1989, when the Briarwood survey occurred
 
 
 [3]
 Briarwood also asserts that some subsidiary violations of the survey process, such as the failure to provide data prefix tags and resident identifiers, resulted from the survey team's failure to complete the SRF before the exit conference and require the invalidation of HHS's decision. However, many of these alleged failures involved actions not required by the regulations or are otherwise unmeritorious. In any event, Briarwood cannot show substantial prejudice from any of these alleged violations, and thus they cannot serve as a basis for invalidating the survey